# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| ADT SECURITY SERVICES, INC., | Civil No. 07-2983 (JRT/AJB) |
| Plaintiff/Counter Defendant, | |
| v. | |
| VICKI SELIGER SWENSON, *as Personal Representative of the Estate of Teri Lynn Lee and as Trustee for the Next-of-Kin of Teri Lynn Lee, Decedent*; T.M.L., T.B.L., T.J.L., and T.M.L., *minors, through their Co-Guardians and Co-Conservators, Erik P. Swenson and Vicki Seliger Swenson*, | **MEMORANDUM OPINION AND ORDER** |
| Defendants/Counter Claimants. | |

Amanda M. Cialkowski, Brian N. Johnson, and Cortney G. Sylvester, **NILAN JOHNSON LEWIS PA**, 120 South Sixth Street, Suite 400, Minneapolis, MN 55402; Charles C. Eblen and J. Stan Sexton, **SHOOK, HARDY & BACON, LLP**, 2555 Grand Boulevard, Kansas City, MO 65108-2613, for plaintiff/counter defendant.

Paul D. Peterson, Lori L. Barton, and William D. Harper, **HARPER & PETERSON, PLLC**, 3040 Woodbury Drive, Woodbury, MN 55129-9617, for defendants/counterclaimants.

# BACKGROUND

I.   PURCHASE OF THE ADT SECURITY SYSTEM ........................................................... 2

II.  AGREEMENT BETWEEN LEE AND ADT ................................................................ 8

III. ALLEGED SECURITY SYSTEM FAILURE ............................................................... 10

IV.  FACTS RELEVANT TO SUMMARY JUDGMENT MOTION ON COMPARATIVE FAULT ..... 12

V.   PROCEDURAL BACKGROUND ............................................................................ 14

**ANALYSIS**

I. SUMMARY JUDGMENT MOTIONS .......................................................................... 15

   A.  Standard of Review ........................................................................................ 15

   B.  Claims Hinging on the Validity and Enforceability of the Agreement ........................................... 16
      1.  Fraud ................................................................................................ 18
      2.  Lack of Completion/Integration .................................................................... 27
      3.  Consumer Protection Statutes ...................................................................... 30
      4.  Exculpatory Provision ............................................................................... 32
      5.  Applicability of Contractual Limitations on Claims of Trustee and Children ................. 38
      6.  Indemnification Provision .......................................................................... 42
      7.  Warranty Claims ................................................................................... 42

   C.  Additional Grounds for Summary Judgment ................................................................. 43
      1.  No Greater Harm ................................................................................... 43
      2.  Causation ............................................................................................ 44
      3.  Strict Liability Claims ............................................................................... 47
      4.  Public Benefit ....................................................................................... 49
      5.  Reliance ............................................................................................. 52
      6.  Payments Made by Hawkinson ..................................................................... 53
      7.  Punitive Damages ................................................................................... 54

   D.  ADT's Motion for Summary Judgment Regarding Comparative Fault ................................. 56


II. MOTIONS TO EXCLUDE ...................................................................................... 60

   A.  Standard of Review ........................................................................................ 60

   B.  ADT's Motions to Exclude ............................................................................... 61
      1.  Jeffrey Zwirn ........................................................................................ 61
      2.  Michael Bayless ..................................................................................... 64
      3.  Joseph Olson ........................................................................................ 66
      4.  Whether Bayless and Olson are Proper "Rebuttal" Expert Witnesses ....................... 68
      5.  Anthony R. Caspers ................................................................................. 71

   C. Counterclaimants' Motions to Exclude ................................................................... 73
      1.  William Lewinski .................................................................................... 73
      2.  Jonathan Arden ..................................................................................... 76
      3.  Henry L. Homrighaus, Jr. .......................................................................... 77
      4.  Paul Schomer ....................................................................................... 78
      5.  Jonathan Jensen ..................................................................................... 79
      6.  James Mooney ....................................................................................... 80
      7.  David Zakrewski .................................................................................... 82


**ORDER** .......................................................................................................... 83

On September 22, 2006, Steven Van Keuren murdered his ex-girlfriend Teri Lynn Lee and Timothy J. Hawkinson, Sr. after breaking into Lee's home.  Plaintiff ADT Security Services, Inc. ("ADT") had recently installed a security system to protect against the lethal threat posed by Van Keuren, but the alarm allegedly did not sound until after the murders were committed.  ADT filed suit against the estates of Lee and Hawkinson, seeking a declaratory judgment that its liability is limited by the Residential Services Contract ("the Agreement") signed by Lee.  Lee's sister, Vicki Seliger Swenson, as the personal representative of the estate ("the Estate") and trustee for the next of kin ("the Trustee") of Lee, subsequently alleged numerous counterclaims against ADT, as did Lee's four children ("the children"), who were in the house when the murders occurred.

This Order addresses seven motions pending before the Court: three for summary judgment and four for the exclusion of certain expert and other testimony. Counterclaimants have moved for summary judgment on ADT's complaint demanding a declaratory judgment, on their own claims for declaratory relief, and for violations of certain consumer protection statutes under Minnesota law.  ADT has filed a consolidated motion for summary judgment on all of the counterclaims.  In addition, ADT has filed a motion for summary judgment on the comparative fault of two law enforcement agencies.

Because there is a genuine issue of material factual dispute as to whether Lee was fraudulently induced to sign the Agreement, the Court denies summary judgment to ADT on most of the counterclaims; several of the counterclaims, however, fail regardless of whether the Agreement was fraudulently induced, while counterclaimants' allegation of gross negligence survives regardless of the dispute regarding fraud.  Since a reasonable factfinder may, but need not, conclude that the Agreement was fraudulently induced, the

Court denies summary judgment to counterclaimants.  As to ADT's summary judgment motion with regard to comparative fault, the Court concludes that further briefing is warranted.  Accordingly, the Court denies the summary judgment motion regarding comparative fault without prejudice.

Also before the Court are four motions by the parties challenging expert and other witnesses.  ADT moves to exclude the testimony of counterclaimants' experts Jeffrey Zwirn, Joseph Olson, and Michael Bayless.  ADT also moves to strike Anthony R. Caspers, proffered by counterclaimants as a rebuttal fact witness, as an expert witness. Counterclaimants move to exclude the entirety of the testimony of ADT's experts William Lewinski, Jonathan Arden, Henry Homrighaus, Paul Schomer, and Jonathan Jensen, and a portion of the testimony of James Mooney, designated as a lay witness under Rule 701.  They have also moved to strike David Zakrewski as an expert witness, but ADT argues that it has not proffered Zakrewski as an expert.

The Court grants the motions to strike Caspers and Zakrewski as experts, but will permit their testimony as fact witnesses.  The Court denies all other instant motions to exclude or strike with two exceptions: the Court will limit the testimony of counterclaimants' experts Zwirn and ADT's expert Lewinski.

## BACKGROUND

## I.      PURCHASE OF THE ADT SECURITY SYSTEM

On July 29, 2006, Lee's ex-boyfriend Steven Van Keuren broke into Lee's home. (Aff. of Lori L. Barton, March 26, 2010, Ex. B at 1, Docket No. 214.)  Lee reported to the police that Van Keuren attempted to kill her, and had disconnected the telephone during

the incident.  (*Id.* at 1-2.)  Van Keuren aborted his mission, however, and left before police arrived.  (*Id.*)  After Van Keuren had been arrested, charged, and released on bond, Hawkinson contacted ADT representative Benjamin Crickenberger to discuss purchasing an ADT security system for the Lee home.  (*Id.*, Ex. D at 74-75.)  Hawkinson explained to Crickenberger that Van Keuren had broken into Lee's home, and that "they were essentially trying to keep this guy out, or at least give them notification" should he again attempt to enter the house.  (*Id.* at 29.)  Crickenberger "dropped everything" and went to Lee's home to meet them.  (*Id.* at 75.)

When Crickenberger arrived at the residence, Lee showed him "the chair that [Van Keuren's] knife had gone through, . . . where their [previous] struggle happened."  (*Id.* at 76.)  He observed Lee's children "running around," and observed that Lee "was pretty frazzled" in discussing her struggle with Van Keuren.  (*Id.* at 75-76.)  Lee told Crickenberger that she was terrified of Van Keuren.  (*Id.* at 79.)

Hawkinson informed Crickenberger that he carried a gun, that "he hated to shoot Van [Keuren], but he thought it was going to come down to that."  (*Id.* at 80.)  Hawkinson owned numerous guns, hunted, and had a permit to carry a concealed weapon which he acquired after a mandatory eight hour training course.  (Aff. of Lori L. Barton, May 12, 2010, Ex. R at 40-41, 46-47, Docket No. 249.)  According to Swenson, Hawkinson carried a gun in a padded fanny pack around his waist and had stated that he would not hesitate "to drop the guy [Van Keuren]."  (*Id.*, Ex. P at 98-99, Docket No. 214.)

Crickenberger presented Lee with a series of ADT promotional materials, similar or the same as those provided Hawkinson.  (*Id.*, Ex. D at 20-21, 236.)  The cover of an

ADT brochure is visible in a photograph of Lee's bedroom at the crime scene. (*Id.*, Ex. F.)  While the brochure in the photograph was subsequently destroyed, Hawkinson's brochure was found at his home following his death. (*Id.*, Ex. G.)  The brochure describes various products sold and installed by ADT, including a Safeguard CellGuard, a cellular back up unit which "**[h]elps keep your alarm system connected to ADT in case your regular phone service goes out.**" (*Id.* at H&P04733 (emphasis added).)  The brochure explains that "cut or fallen lines . . . can disrupt your regular phone service[,] [but] Safewatch CellGuard automatically reconnects you via a wireless network." (*Id.* at H&P04741.)  As ADT's counsel explained at oral argument, the Telular TG-4, which was ultimately installed in the Lee residence, is a cellular back up unit which functions like the CellGuard but is produced by another company.

ADT's Model Sales Call, which Crickenberger was instructed to follow,[1] advises representatives to tell potential customers that if an intruder enters their home, "[he] will be **greeted by a shrill siren** to drive [him] off" once a point of protection has been breached. (*Id.*, Ex. E at ADT002910 (emphasis added), ADT006382; *see also id.* at

---

[1] ADT argues that the "Model Sales Call Appendix" frequently cited by counterclaimants was never distributed by ADT to its employees.  It also objects that counterclaimants have not established that the training materials they cite were applicable in 2006.  However, Crickenberger testified that as part of his job training, he completed an ADT course entitled "Selling to the Residential Market," which included a discussion of ADT's "Model Sales Call." (*Id.*, Ex. D at 11; Ex. E at ADT006308.)  When shown an ADT Sales Representative Agreement in which representatives "agree to learn the Model Sales Call Process and follow it in all future sales presentations of ADT's products and services to potential ADT customers[,]" Crickenberger testified that he had agreed to follow the protocol, although he characterized the Model Sales Call Process as "a guideline". (*Id.*, Ex. D at 20; Ex. E at ADT002918.)  Crickenberger also authenticated the "Selling to the Residential Market" curriculum. (*Id.*, Ex. D at 11-14.)  The Court concludes that these materials are admissible evidence, although a jury can certainly decide what weight to accord them.

ADT002963, ADT002942.)   Representatives are also advised to promote motion detectors by explaining to customers that

> no matter what part of the house [intruders] come from, they have to go up the stairs to get to your sleeping family or valuables.  When they get anywhere near this area, . . . what happens?  This motion detector can "see" them before they get near the stairs.  When it does, it can sound a loud alarm and send a signal to [ADT]. . . . Can you see why that motion detector is so important?

(*Id.* at ADT002942.)   The parties agree that Lee's ADT security system included these motion detectors.

The Model Sales Call explains how representatives should respond to potential customers' concerns about cut telephone lines:

> Let's say that you get one of the more advanced criminals who understands a little more about how security systems work.  Let's say he approaches your home and goes around to the place where the phone line comes into the house and cuts the line.  At that point, **your alarm will make a loud noise (assuming your system is armed)**, but the signals will not reach [ADT] . . . .  If the phone line is cut, . . . then CellGuard can help provide an alternative means for the signal to be transmitted. . . .  Wouldn't you feel more comfortable knowing you had that kind of protection?

(*Id.* at ADT002934 (emphasis added).)

Although the TG-4 has the capacity to alert ADT as soon as telephone lines are cut ("line fault monitoring"), Crickenberger understood that ADT had stopped enabling that capability because of the large number of false alarms.[2]  (*Id.*, Ex. D at 70-72; Ex. I at 15-

---

[2] One ADT service technician, however, testified that that **he has seen, installed, and/or serviced ADT residential systems with line fault monitors, and was never told by ADT not to install a line fault monitor**.  (Barton Aff., Ex. GG at 7-8, 24, Docket No. 249.)  This individual, initially hired by ADT in 1997, testified that he knew of no one else in his office who knew more than he did about the technical aspects of ADT residential security systems.  (*Id.* at 6, 12.)

18 (filed under seal[3]).)   According to Crickenberger, the unit would also not issue an immediate alarm to the residents of the home if the telephone lines were cut.   (Barton Aff., Ex. B at 72, 118-19, Docket No. 214.)   Nonetheless, in response to Lee and Hawkinson's concerns about the vulnerability of their telephone lines being cut, Crickenberger recommended that they purchase the TG-4 cellular unit.[4]   (*Id.*, Ex. D at 60, 115-16, 136.)

ADT's Model Sales Call instructs its representatives to "[r]emember to point out [to potential ADT customers] the vulnerability of sliding glass doors."   (*Id.*, Ex. E at ADT002939.)   While conducting a review and walk-through of the Lee home, Crickenberger and Hawkinson discussed placing a glass break detector by the sliding glass door in Lee's basement.   (*Id.*, Ex. B at 40-41.)   According to Crickenberger, Hawkinson "believed that the glass door down there was the most logical place for somebody to break in."   (*Id.* at 38.)   Crickenberger therefore designed the security system to include glass break protection on the basement door.   (*Id.* at 41, 136-37.)

---

[3] The Court will note citations to docket entries filed under seal.  After a careful review of the record, the Court believes that its citations to sealed material support facts acknowledged and assertions made publicly by the parties at the motion hearings and in pleadings.

[4] ADT objects to counterclaimants' assertion that "Hawkinson expressed his and Lee's concerns about the vulnerability of the outside phone lines . . . ."  The cited testimony, as well as other record evidence, is sufficient to support an inference that counterclaimants' assertion is accurate.  For example, Crickenberger agreed with the statement, "Tim Hawkinson was mindful of the vulnerability of the phone lines right in this corner of the house, correct?"  (*Id.* at 115; *see also* Ex. P at 104.)  A review of the deposition testimony in this case reveals that ADT's objections were frequent and myriad, as illustrated in footnote 11 of this Order.  In deciding the instant motions, the Court has carefully reviewed the cited testimony to avoid relying upon any inadmissible evidence.  The Court hereby overrules ADT's objections to **all testimony cited in this order**.

Crickenberger also designed the system to include motion detectors to detect an intruder who "gained entry [to the Lee house] in any other way." (*Id.* at 137-38.)

A day or two after Crickenberger's visit to the Lee home, he met Hawkinson and Lee in the parking lot at the Washington County Sheriff's Office. (*Id.* at 190-92.) He reviewed the Agreement with them on the hood of a car, and then acquired Lee's signature on the contract as well as Hawkinson's "for payment." (*Id.* at 195.) The interaction lasted approximately five to ten minutes. (*Id.*, Ex. B at 220.) Lee is identified as the "customer" on the Agreement, although Hawkinson paid for the security system. (*Id.*, Ex. K at ADT000024; Aff. of Charles C. Eblen, May 12, 2010, Ex. A at 23, Docket No. 246.) According to Swenson, Hawkinson agreed to buy the alarm system for Lee without expecting that Lee would pay him back. (Barton Aff., Ex. Z at 116-17, Docket No. 214.)

On August 7, 2006, ADT representative Dean Dosse visited the Lee home to install, program, and test the ADT security system. Dosse knew that Van Keuren had threatened Lee previously and had also threatened to return to the house to kill her. (*Id.*, Ex. J at 126-27.) He also knew that the outside telephone lines were vulnerable to being cut and that Lee had purchased the TG-4 to address this potential vulnerability. (*Id.* at 15-17, 27-28.) Dosse nonetheless disabled the TG-4's line fault monitoring capability, an action which he testified comported with ADT's policy of not monitoring telephone lines. (*Id.* at 84-85.) Dosse did not inform Lee or Hawkinson that the system lacked telephone line fault monitoring. (*Id.* at 265.)

Dosse moved the glass break detector designed to cover the sliding glass door in the basement to a basement window, allegedly pursuant to a discussion with Hawkinson

- 7 -

regarding the vulnerability of the windows. (*Id.* at 43-44; Ex. D at 42.) Dosse intended the motion detector to protect the sliding glass door. (*Id.*, Ex. D at 42.) Crickenberger subsequently learned of the deviation from his original design, but did not follow up with Lee or Hawkinson. (*Id.*, Ex. D at 62.)

## II.   AGREEMENT BETWEEN LEE AND ADT

The Agreement signed by Lee and ADT represents that ADT's representative has "EXPLAINED TO [THE CUSTOMER] THE FULL RANGE OF EQUIPMENT AND SERVICES AVAILABLE TO [HER]." (*Id.*, Ex. K at ADT000024.) According to Crickenberger, he informed Lee and Hawkinson of all the features that he could offer residential customers. (*Id.*, Ex. D at 70-71.) However, contrary to the guidance provided by ADT's Model Sales Call, Crickenberger testified that he did not inform them of the cellular unit's capacity to alert ADT and sound an alarm in the event that telephone lines are cut because ADT policy is to disable that feature. (*Id.*) At least one other ADT representative, moreover, testified that **ADT does not provide a potential purchaser information on all the choices available**. (*Id.*, Ex. L at 64-65; Ex. M at 74.)

The Agreement also contains an exculpatory and limitation of liability provision ("the exculpatory provision"):

> YOU AGREE THAT WE AND OUR AGENTS . . . ARE EXEMPT
> FROM LIABILITY FOR ANY LOSS, DAMAGE, INJURY OR OTHER
> CONSEQUENCES ARISING DIRECTLY OR INDIRECTLY FROM
> THE SERVICES . . . WE PERFORM OR THE SYSTEMS WE PROVIDE
> UNDER THIS CONTRACT. IF IT IS DETERMINED THAT WE OR
> ANY OF OUR AGENTS, EMPLOYEES, SUBSIDIEARIES,
> AFFILIATES OR PARENT COMPANIES ARE DIRECTLY OR
> INDIRECTLY RESPONSIBLE FOR ANY SUCH LOSS, DAMAGE,
> INJURY OR OTHER CONSEQUENCE, YOU AGREE THAT
> DAMAGES SHALL BE **LIMITED TO . . . $500** . . . . THEY ARE

YOUR **SOLE REMEDY NO MATTER HOW THE LOSS, DAMAGE, INJURY OR OTHER CONSEQUENCE IS CAUSED, EVEN IF CAUSED BY OUR NEGLIGENCE, GROSS NEGLIGENCE, FAILURE TO PERFORM DUTIES UNDER THIS CONTRACT, STRICT LIABILITY, FAILURE TO COMPLY WITH ANY APPLICABLE LAW, OR OTHER FAULT.**

(*Id.*, Ex. K at ADT000027 (emphasis added).)  In addition, the Agreement includes an

integration clause:

THIS CONTRACT CONSTITUTES OUR ENTIRE AGREEMENT.  BY SIGNING IT YOU ADMIT THAT YOU ARE NOT RELYING ON OUR ADVICE OR ADVERTISEMENTS.  YOU AGREE THAT YOU AND WE ARE NOT BOUND BY ANY REPRESENTATION, PROMISE, CONDITION, INDUCEMENT OR WARRANTY, EXPRESS OR IMPLIED, THAT IS NOT INCLUDED IN WRITING IN THIS CONTRACT.

(*Id.* at ADT000003.)

The Agreement provides a ninety day warranty for repair or replacement of

defective equipment or services, and explicitly provides for:

"**NO OTHER WARRANTIES**.   OTHER THAN THE LIMITED WARRANTY AND, IF PURCHASED, THE EXTENDED LIMITED WARRANTY, WE MAKE NO GUARANTEE OR WARRANTY OF ANY KIND . . . .   YOUR EXCLUSIVE REMEDY IS SET FORTH ABOVE."

(*Id.*)

Crickenberger testified that he explicitly told Lee and Hawkinson that ADT would

receive no signal if the telephone lines were cut.  (Ex. B at 118-19.)  However,

counterclaimants have proffered the testimony of Lee's sister, Swenson, that Lee

believed her phone lines were monitored and that an audible alarm would sound if the

lines were cut.  (*Id.*, Ex. P at 104.)  Lee and her sister, who also had a security system,

compared their systems in detail.  (*Id.* at 100.)  According to Swenson, Lee also thought

her system was set up to provide an "instant" alarm in the event of a break in, and that her basement glass door was armed with glass break protection.  (*Id.* at 105-107, 110-12.)

## III.   ALLEGED SECURITY SYSTEM FAILURE

On September 22, 2006, Van Keuren drove to the Lee home, cut the exposed telephone lines with wire cutters, broke the glass on the sliding glass door in the basement with a crowbar, walked up the stairs past two motion detectors to the master bedroom, and shot both Lee and Hawkinson multiple times, killing them both, while Lee's four children were upstairs.  Van Keuren testified that after cutting the telephone wires, he walked towards the basement door "very slowly" to avoid detection.  (Barton Aff., Ex. I at 11, Docket No. 249.)  He also testified that he did not know about Hawkinson and he was unaware that Lee had a security system.  (*Id.* at 11, 21.) According to Van Keuren, he changed his mind about whether to kill himself or whether to kill Lee several times the night of the murders.  (*Id.* at 21, 42.)

T.M.L., Lee's daughter, was asleep in her mother's bedroom when Van Keuren entered; she testified that she awoke to the sound of gunshots.  (Barton Aff., Ex. Q at 62, Docket No. 214.)  According to counterclaimants, **the first time the security system sounded an audible alarm that night was after the murders, when T.M.L. and her sister ran out the front door of the house to escape Van Keuren.**  (*Id.*; *see also* Aff. of Molly Borg Thornton, June 11, 2010, Ex. L at 13, Docket No. 273.)  Van Keuren's testimony is that the alarm went off for the first time when he was at the top of the stairs, just prior to his entering Lee's bedroom.  (Thornton Aff., Ex. L at 13, Docket No. 273.)

That same day, an ADT service technician visited the Lee home after the murders. (Barton Aff., Ex. U at ADT004999, Docket No. 214 (filed under seal).)  He determined that the system was armed, but that no signals had been sent to ADT since a test run on September 13, 2006.  (*Id.* (filed under seal); Ex. V at 60 (filed under seal).)  The technician observed that "[t]he phone line had been cut but there was a TG-4 on the system."  (*Id.*, Ex. U at ADT004999.)  He speculated about reasons for the failure, including the possibility that the customer had Voice Over Internet Protocol ("VOIP") service and the "modem [may] have fooled the TG-4 into believing that the phone line was still OK[,]" in which case "we could have other potential problems out there."  (*Id.*) Lee did have VOIP phone service in her home.  (Answer to Trustee's Countercls. ¶ 264, Docket No. 203 (filed under seal).)  The technician subsequently testified that the alarm panel reflected activity in the zone applicable to the basement area of the house. (Thornton Aff., Ex. K at 81, Docket No. 273.)

According to counterclaimants' expert Jeffrey Zwirn,[5] ADT failed to properly install the system and improperly placed, wired, and located intrusion detection devices. (Aff. of Jeffrey D. Zwirn, Sept. 14, 2009, Ex. B ("Zwirn Report") at 32, Docket No. 215.) Zwirn further opines that Dosse did not enable the built-in line fault monitor feature contained within the system's control panel, did not physically connect the TG-4 to the control panel, did not properly program the control panel, and did not properly program or test the back up.  (*Id.* at 60-72.)  The system was armed in "instant mode" the night of the murders.  (*Id.* at 35.)  However, counterclaimants allege that no alarm sounded when

---

[5] As discussed below, ADT has not objected to the admissibility of Zwirn's testimony regarding the alleged failures in the ADT security system.

Van Keuren entered the home and walked up the stairs into Lee's bedroom.  (Barton Aff., Ex. Q at 62, Docket No. 214.)

Dosse testified that he was not supposed to deviate from the equipment manufacturer's specifications or from ADT policy in programming, installing, and testing ADT equipment.  (*Id.*, Ex. J at 137-38.)  However, Zwirn's report contains references to ADT Residential Technical Standards, as well as numerous standards of national associations which he asserts were deliberately disregarded by ADT and Dosse.  (Zwirn Report at 44-54, Docket No. 215.)

## IV.   FACTS RELEVANT TO SUMMARY JUDGMENT MOTION ON COMPARATIVE FAULT

ADT argues that the Washington County Sheriff's Office and the St. Paul Park Police Department are at fault for the death of Lee for their failure to arrest Van Keuren in the days and hours preceding Lee's death.

After Van Keuren was charged with assaulting Lee in her home on July 29, 2006, he posted bail and was released from Washington County Jail on August 1, 2006.  (Aff. of Charles C. Eblen, March 24, 2010, Ex. A at 6, Docket No. 201.)  The state court judge presiding over his case ordered Van Keuren to have no contact with Lee, stating: "If you are caught within a mile of her residence, you are in violation of this order and you are going to be picked up or going to be thrown in jail . . . ."  (*Id.*)

On September 6, 2006, Lee received an email message at her place of employment, 3M, signed by Dick Van Keuren, Steven Van Keuren's father, which read: "Terry – How are you and the kids doing?  I would like to pick up Steve's property. When would it be good for you?  Can you do one thing for me and call Steve, he would

like to talk and apologize to you.  If you can." (*Id.*, Ex. C.)  Lee reported this message, which she believed was actually from Van Keuren, as well as two suspicious phone calls from an unknown pay phone, to Investigator Greg Reiter of the Washington County Sheriff's Office.  (*Id.*)

Reiter traced the unknown phone number to a gas station in Maplewood, Minnesota.  (*Id.*)  He then forwarded a copy of his report and a copy of the email to the Maplewood Police Department on September 19, 2006, as no part of the alleged crime occurred in Washington County.  (*Id.*)  Officer Julie Olson of the Maplewood Police Department attempted to contact Dick Van Keuren, who returned her phone call on September 21, 2006.  (Aff. of Lori L. Barton, Apr. 23, 2010, Ex. F at 6, Docket No. 231.)  Dick Van Keuren confirmed that he had sent an email to Lee regarding his son's property.  (*Id.*)  Accordingly, Officer Olson determined that no violation had occurred. (*Id.*)  As Reiter testified, there was no probable cause to arrest Van Keuren for violating the no contact order at that time.[6] (*Id.*, Ex. G at 28.)

On September 20, 2006, Van Keuren appeared at a junior high school in St. Paul Park where Lee's eldest daughter was playing volleyball.  (*Id.*, Ex. I.)  Van Keuren left before the police arrived.  (*Id.* at H&P02195.)  Officer Zilge of the St. Paul Park Police Department reported to the school, spoke with witnesses, and concluded that Van Keuren had violated the no contact order.  (*Id.* at H&P02197.)  Officer Zilge contacted the on-duty Washington County Attorney, Mike Hutchinson, who advised him to issue Van

---

[6] After the murders, Dick Van Keuren admitted that Steven Van Keuren sent the email message from his computer. (*Id.*, Ex. H at H&P02304.)

Keuren a citation instead of having an out-of-state police department covering the jurisdiction in which Van Keuren lived attempt to locate him.  (*Id.*)  Zilge planned to mail the citation to Van Keuren on September 25, 2006, after returning to duty after days off and reviewing the report.  (*Id.* at H&P02198.)  In light of the murders of September 22, 2006, and the fact that Van Keuren was already in custody, Zilge did not send the citation.  (*Id.*)  Instead, the case was referred to the St. Paul Park City Attorney.  (*Id.*)

## V.     PROCEDURAL BACKGROUND

ADT filed this action for declaratory relief against the Estate and Hawkinson,[7] asking the Court to enforce the provisions in the Agreement limiting ADT's liability and to conclude that all duties implicated in this case arise from the Agreement, not from common law claims sounding in tort.  The Estate, the Trustee, and the children have subsequently filed numerous counterclaims against ADT.

Specifically, the Estate alleges numerous counts of fraud, misrepresentation by omission, and negligent misrepresentation; the Estate also moves for a declaratory judgment voiding the Agreement.  In addition, the Estate, the Trustee, and the children allege violations of various consumer protection statutes, breach of express and implied warranties, violations of the Prevention of Consumer Fraud Act, violations of the False Statement in Advertising Act, and unlawful trade practices.  They also assert a claim for punitive damages.   The Trustee and children allege negligence, gross negligence, negligent design, strict liability, negligent instruction and failure to warn, strict liability,

---

[7] ADT has settled its claims against Hawkinson's estate.

and vicarious liability.  The children allege a separate count of negligent infliction of emotional distress.

On December 17, 2009, United States Magistrate Judge Arthur J. Boylan granted in part and denied in part the Swenson counterclaimants' motion to amend their counterclaims to assert claims for punitive damages.  (Docket No. 165 (filed under seal).) The Magistrate Judge limited the punitive damages claims to the Estate's common law fraud claim and misrepresentation by omission claim, and the Trustee's claim for strict liability based on design defect.  (*Id.* at 26-27.)  No part of this order was timely appealed.

ADT has filed a consolidated motion for summary judgment on all of the counterclaims.  Counterclaimants have moved for summary judgment on both counts of ADT's complaint, and on their own claims for declaratory relief and for violations of consumer protection statutes.  In addition, ADT has filed a motion for summary judgment on the comparative fault of Washington County Sheriff's Office and the St. Paul Park Police Department ("the police departments").  Also pending before the Court are four motions to strike the testimony of experts and other witnesses.

## ANALYSIS

## I.     SUMMARY JUDGMENT MOTIONS

### A.     Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit,

and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Minnesota law applies in this case based on diversity jurisdiction.  *See Integrity Floorcovering, Inc. v. Broan-Nutone, LLC*, 521 F.3d 914, 917 (8th Cir. 2008).  "In resolving any substantive issues of state law, [the Court is] bound by the decisions of the Minnesota Supreme Court."  *Id.*  "If the Minnesota Supreme Court has not spoken on a particular issue, [the Court] must attempt to predict how the Minnesota Supreme Court would decide an issue and may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data."  *Id.* (omission original, quotation marks omitted).

### B.    Claims Hinging on the Validity and Enforceability of the Agreement

Central to the parties' dispute is the validity and enforceability of the Agreement. ADT moves for summary judgment on the Estate's declaratory judgment claims and warranty claims, and the Trustee's negligence, vicarious liability, and warranty claims, arguing that they are barred by the exculpatory provision in the Agreement.  The Agreement, signed by Lee, provides that ADT is exempt from liability for any loss, damage, or injury arising from ADT's services "NO MATTER HOW THE LOSS, DAMAGE, INJURY OR OTHER CONSEQUENCE IS CAUSED . . . ." (Barton Aff.,

Ex. K at ADT000027, Docket No. 214.)  Alternatively, the exculpatory provision limits ADT's liability to the greater of $500 or 10% of the annual service charge; in Lee's case, the $500 cap would apply.  (*Id.*)

Generally, parties are free to allocate risk contractually, and courts consistently uphold exculpatory provisions in contracts for the installation and servicing of burglar alarms.  *See Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir. 1993) (collecting cases); *Spengler v. ADT Sec. Servs., Inc.*, No. 06-CV-10036-DT, 2006 WL 3004088, at *6-7 (E.D. Mich. Oct. 20, 2006) (rejecting plaintiff's characterization of similar ADT agreement as designed to mislead).  If the Agreement is enforceable in its entirety, then ADT is entitled to summary judgment on the majority of the Trustee's (and, as discussed below, the children's) tort claims.   As the Minnesota Supreme Court explained, in considering the duty ADT owed a jewelry store owner with which it contracted to provide alarm services:

> [Plaintiff's] assertion, . . . [that] "(o)nce defendant undertook to provide [alarm] services, a duty to exercise reasonable care in performing them arose, regardless of what the contract subsequently entered into did or did not provide with respect thereto" misstates the case entirely.  ADT did not "undertake" anything until the contract was signed. . . .  There is little doubt that if the contract had not been signed, no obligation would exist on the part of either party.  The obligations arose when the contract was signed and are therefore bounded by the terms of the contract.

*Vermes v. Am. Dist. Tel. Co.*, 251 N.W.2d 101, 103 (Minn. 1977) (second alteration original).

However, counterclaimants have raised several bases under Minnesota law on which to void the Agreement or parts of it.  Counterclaimants ask the Court to conclude that the Agreement is void and unenforceable because it was fraudulently induced,

incomplete on its face, and voided in writing by Swenson after the murders; they also argue that the Agreement is inapplicable to acts occurring before it was signed, and that it is overbroad and should at least be limited in its applicability. The Court considers each argument, as well as several others hinging on the enforceability of the Agreement, in turn.

### 1. Fraud

First, counterclaimants argue that the Agreement is void and unenforceable because, as alleged by the Estate, Lee was fraudulently induced to sign it. Under Minnesota law, "a fraudulent misrepresentation can void a contract even though the misrepresentation was not included in the contract." *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 716 N.W.2d 366, 375 (Minn. Ct. App. 2006); *see also L. Luria & Son, Inc. v. Honeywell, Inc.*, 460 So. 2d 521, 523 (Fla. Dist. Ct. App. 1984) (claim that buyer of alarm system was fraudulently induced to enter into contract by unfounded promise that alarm company would notify buyer and police in the event of a malfunction in the system not undermined by exculpatory clauses found in alarm system contract).[8]

There are five elements of a claim of intentional misrepresentation constituting fraud:

> (1) a false representation by [ADT] of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [Lee] to act in reliance thereon; (4) that the

---

[8] There was no record evidence that ADT acted **fraudulently** in *Vermes*, the case in which the Minnesota Supreme Court found that ADT's obligations to its customer arose solely out of the contract. 251 N.W.2d at 103.

representation caused [Lee] to act in reliance thereon; and (5) that [Lee] suffered pecuniary damages as a result of the reliance.

*Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009). "The fraud exception to the parol evidence rule authorizes admission of evidence regarding fraudulent oral representations by one party which induce another to enter into a written contract." *Little v. Colorbrite, Inc.*, No. C2-90-1135, 1990 WL 163102, at *1 (Minn. Ct. App. Oct. 30, 1990). "This evidence cannot vary the terms of the contract, but may establish that the parties did not make an enforceable contract." *Id.* Integration clauses, such as the one at issue in the Agreement, "do[] not prevent proof of fraudulent representations by a party to the contract." *Johnson Bldg. Co. v. River Bluff Dev. Co.*, 374 N.W.2d 187, 193 (Minn. Ct. App. 1985).

According to the Estate, ADT made intentional misrepresentations (a) in its promotional materials, (b) in the performance of its Needs Analysis and design of a customized home security system, (c) regarding its telephone line monitoring, (d) regarding the full range of equipment and services, and (e) regarding the complete installation of the system. (Estate's Countercls. 2-6, Docket No. 181 (filed under seal).)

Instead of explaining how each element of fraud is satisfied by specific record evidence for each its five counterclaims of fraud, counterclaimants instead refer the Court to the lengthy fact section of its brief and a New York trial court order denying a security company's **motion to dismiss** claims brought by homeowners whose home was burglarized after the telephone lines were cut and without triggering a promised response from the security company. *Cirillo v. Slomin's Inc.*, 768 N.Y.S.2d 759 (N.Y. Sup. Ct. 2003). At the summary judgment stage, however, counterclaimants "may not rest upon

the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586, n.11 (quotation marks omitted); *see also Grace Capital, LLC v. Mills*, No. A09-1857, 2010 WL 3396817, at *4 (Minn. Ct. App. Aug. 31, 2010) (holding that "a party must produce particular evidence of all material facts for which it bears the burden of proof at trial[,]" and failure to do so justifies summary judgment against that party); *see also* Fed. R. Civ. P. 56(c)(3) (on a summary judgment motion, "[t]he court need consider only the cited materials, but it may consider other materials in the record.").

It appears that counterclaimants' claim of intentional misrepresentation with regard to the Needs Analysis and design of a customized home security system is based on representations in ADT material that ADT was conducting a "Needs Analysis" and "Security Review and Walk-Through[,] Creating a security system **specifically for you**." (Barton Aff., Ex. E at ADT001805-1806, Docket No. 214 (emphasis added); *id.* at ADT002961.)  The counterclaim rests on the fact that ADT actually installs its systems in a standardized manner.  However, the representations on which counterclaimants rely do not appear in the ADT brochure found in Hawkinson's and Lee's home.  (*Id.*, Exs. G, H.) Counterclaimants have not cited evidence, such as testimony by Crickenberger or Swenson, that these representations were made to Lee, let alone evidence that the statements were intentional, fraudulent misrepresentations on which Lee relied in signing the Agreement.  Even if, as counterclaimants allege, ADT installs its systems in a uniform manner, it does not follow that it fails to create a security system specific to each customer.

The Estate alleges fraud by intentional misrepresentation in ADT's promotional materials, but counterclaimants have not specified allegedly fraudulent statements on which this claim is based beyond the specific misrepresentations underlying the other counterclaims of fraud.  Likewise, the Court is unable to ascertain what record evidence counterclaimants rely on to support the counterclaim for fraud based on ADT's alleged misrepresentation regarding the complete installation of the system.  From the Court's review of the record, no reasonable factfinder could conclude that ADT made false statements regarding a **past** or **existing** material fact relating to the complete installation of the system in order to induce Lee to sign the Agreement.  Accordingly, the Court concludes that ADT is entitled to summary judgment on these three counterclaims.

The Estate has, however, pointed to specific representations regarding ADT's telephone line monitoring.  ADT asserts that Crickenberger explicitly told Lee and Hawkinson that ADT would receive no signal in the event that the telephone lines were cut, but it has pointed to no evidence undermining the assertion in its Model Sales Call that cut telephone lines would at least trigger an audible alarm inside the home, a feature that Crickenberger knew would be absent from the installation process.  Both Crickenberger and Dosse testified that they knew of the concern regarding cut telephone lines, and that Lee purchased the TG-4 specifically to address this potential vulnerability.  As discussed below, Lee's alleged belief was consistent with the position articulated in

the Model Sales Call and a knowledgeable ADT technician offered testimony suggesting that ADT did **not** have a policy of disabling the telephone fault line monitoring feature.[9]

The premise of the Estate's fraud claim regarding the full range of equipment is the Agreement itself.  The Agreement states that ADT has relayed to Lee the full range of equipment and services available to her, but Dosse testified that the only way a customer would learn about the line fault monitor capability in the cellular unit was if she were to specifically ask about it, and only then would Dosse advise her that ADT does not monitor telephone lines.  (*Id.*, Ex. J at 157, 162.)  The unit was also capable of sounding an alarm inside the home in the event that an intruder cut the telephone wires, but Crickenberger knew no alarm would sound in those circumstances.  Moreover, one ADT representative specifically testified that he does not explain the full range of services to customers.  (Barton Aff., Ex. X at 64-65, Docket No. 249.)  Besides issues with the line fault monitoring, counterclaimants allege that ADT never offered Lee other commonly used detection and warning devices including one or more additional glass break detectors, presuming a factfinder believes Dosse's testimony that he moved the glass break detector from the basement door after consulting with Hawkinson.

---

[9] In addition to alleged misrepresentations that cut telephone lines would trigger an audible alarm inside the residence, counterclaimants also cite the ADT brochure promoting the cellular unit as a feature that will **maintain connectivity to ADT** if regular telephone service is lost.  From the presence of VOIP in Lee's home, evidence that ADT knew of connectivity issues regarding VOIP and the TG-4, Zwirn's conclusions about ADT's failures in the design and installation of the system, the technician's determination that no signal was sent to ADT, and other record evidence, a reasonable factfinder could conclude that ADT fraudulently misrepresented to Lee the fact that the cellular back up unit would maintain connectivity to ADT.

ADT argues that all of counterclaimants' fraud claims must fail because they cannot establish reliance.  "Essential to a finding of [intentional] misrepresentation are the elements of justifiable reliance and inducement."  *Vogt v. Carriage Hills Golf Club*, 418 N.W.2d 536, 538 (Minn. Ct. App. 1988); *see also* Restatement (Second) of Torts § 537 cmt. a. ("If the recipient [of a fraudulent misrepresentation] does not in fact rely on the misrepresentation, the fact that he takes some action that would be consistent with his reliance on it and as a result suffers pecuniary loss, does not impose any liability upon the maker.").

As evidence of reliance, counterclaimants highlight Lee's conversations with her sister, daughter, parents, co-workers, and friends,[10] which indicate that Lee believed she had a "top of the line" security system including glass break detectors and "everything

---

[10] Counterclaimants also cite the following testimony by Dosse:

[DOSSE]: Ultimately the customer has control of what happens.

BY MR. HARPER:

Q:    They have control based upon your recommendations?

A:    They make the decisions, yes.

Q:    Those decisions are based on your recommendations?

A:    Yes.

Q:    As you were working with Tim Hawkinson and Teri Lee, did you have reason to believe they were relying on you?

     MR. SEXTON: Object to the form.   You may answer.

     A:    Yes.

(Barton Aff., Ex. J at 282, Docket No. 214.)  Dosse's testimony is merely a general statement about the trust ADT customers place in installation technicians; it does not suggest any particular misrepresentation made by ADT on which Lee allegedly relied.

else[,]" and that she felt secure in her home only because the system was installed.  (*See, e.g.*, Barton Aff., Ex. CC at 30-31, Docket No. 249.)

In her conversation with Swenson, the two women "compared [their alarm systems] in detail." (Barton Aff., Ex. P at 100, Docket No. 214.)  Lee allegedly told her sister that she believed her telephone lines were monitored, that an audible alarm would sound instantly if the lines were cut or the perimeter breached, and that her basement glass door was armed with glass break protection.  (*Id.* at 103-07, 110-12.)  Indeed, the "first thing [Lee] brought up [in her conversation with Swenson] was the phone wires[,]" indicating its primacy in her decision to sign the Agreement.  (*Id.* at 103.)  From this testimony, a reasonable factfinder could infer that in signing the Agreement Lee relied upon ADT's representations regarding its full range of equipment and services and telephone line monitoring.

ADT asserts that the testimony of Lee's co-workers, family, and friends is inadmissible hearsay.  *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").   However, counterclaimants are not using this testimony to prove the truth of the matter asserted – i.e. that Lee in fact had a top of the line system, or that an audible alarm would in fact sound instantly if the telephone lines were cut – but rather to show what Lee was led to believe about her ADT security system and why she purchased that particular system.   As such, the testimony is generally admissible. *See, e.g.*, *Garner v. Mo. Dept. of Mental Health*, 439 F.3d 958, 959 (8th Cir. 2006) (statement admitted to explain an action, rather than to prove the truth of the matter

asserted, not hearsay); *Suggs v. Stanley*, 324 F.3d 672, 681 (8th Cir. 2003); *see also* Fed. R. Evid. 803(3) (statements reflecting a declarant's state of mind not inadmissible as hearsay).  The Court will, however, consider hearsay objections to specific testimony offered at trial as warranted.

ADT points to a dearth of evidence explicitly proving that Lee's conceptions and beliefs about her security systems originated with statements by ADT.  For example, Swenson testified that Lee did not tell her sister that "the ADT guy told me A, B or C[,]" and that Lee did not use the names of any ADT representative when discussing her security system.  (Barton Aff., Ex P. at 100, Docket No. 214.)  A reasonable factfinder, however, may **infer** reliance on ADT's misrepresentations from Lee's alleged statements as well as a review of ADT's training materials offering its representatives guidance on what to tell potential customers.

ADT's two additional arguments regarding counterclaimants' fraud claims are unavailing.  ADT argues that counterclaimants cannot establish fraud because the sale of the ADT system originated with Hawkinson's inquiry to ADT, but it cites no evidence or caselaw in support of the proposition that initiating contact with a business gives it blanket cover to make intentional misrepresentations to a potential customer.

In addition, ADT urges that counterclaimants cannot establish pecuniary damage, the final element of a fraud claim, because Hawkinson made all payments to ADT related to the security system in Lee's residence.  Crickenberger's manager, however, testified that ADT requires that the Agreement is signed by the owner of the home in which the security system will be installed, and that the individual who signs the Agreement is

responsible for the payment regardless of whether another individual, such as a husband, makes payments.[11]   (Barton Aff., Ex. G at 23-25, Docket No. 249.)  Lee is identified as the "customer" on the Agreement.  (Barton Aff., Ex. K at ADT000024, Docket No. 214.)  According to Swenson, Hawkinson agreed to pay for the alarm system without requiring Lee to pay him back.  (*Id.*, Ex. Z at 116-17.)  In other words, it was a gift.  *See Weber v. Hvass*, 626 N.W.2d 426, 431 (Minn. Ct. App. 2001) ("A gift requires that the donor deliver the property to the donee, **or to someone for him**, with intent to vest title in the donee, and without reserving any right to reclaim the property." (emphasis original)

---

[11]   ADT objects to counterclaimants' characterization of the manager's testimony "that whoever signed the contract as the purchaser is ultimately responsible for the payment on that contract, not the person who agreed to pay for it."  ADT also lodged objections to the deposition testimony on which counterclaimants' assertion is based.  This record citation offers an illustration of the numerous similar objections made by ADT to counterclaimants' proffered deposition testimony and in response to counterclaimants' statement of facts.  From the manager's deposition:

> Q:   The same question as to someone who is willing to pay for a system, would you consider them a purchaser?
>
> MR. EBLEN:  Object to form, and foundation.  Calls for speculation.  Calls for an improper legal conclusion.  You may answer.
>
> THE WITNESS: No.

BY MR. HARPER:

> Q:   When a contract goes bad – and you did collection work – would you be attempting to collect from the party who gave the initial payments on the system or the homeowner?
>
> MR. EBLEN:  Same objection.
>
> THE WITNESS: Whoever signed the contract is responsible for the payment on that contract, regardless if there is –  if it's coming out of a husband –  a lot of – example, we'll get a contract in the wife's name and the husband is paying for it.

(*Id.* at 23-24.)  As discussed above, the Court overrules ADT's objection to this testimony and concludes that it is admissible.  The Court further accepts counterclaimants' characterization of the testimony as reasonable.

(quotation marks omitted)).  The Court cannot conclude, in these circumstances, that Lee suffered no pecuniary damage from the alleged fraud as a matter of law.

Counterclaimants' evidence regarding the full range of services and telephone line fault monitoring, if proven, is sufficient to support a claim of fraudulent, intentional misrepresentation.  However, numerous material factual disputes dictate a denial of summary judgment in the Estate's favor on these issues.  For example, a jury may not believe Swenson's testimony about Lee's statements, and it may accept Crickenberger's testimony that he told Lee and Hawkinson that the system contained no telephone line fault monitoring.  Accordingly, the Court denies summary judgment to both parties on these two counterclaims of fraud.

## 2. Lack of Completion/Integration

Counterclaimants argue that the Agreement is not a valid, enforceable contract because it is incomplete on its face and not a fully integrated agreement.  Specifically, counterclaimants cite discrepancies between the signatories' understanding and the Agreement.  Although Dosse testified that Lee rejected the seven day familiarization period following installation during which ADT will not respond to any alarm signal it receives, Lee's initials affirming the rejection do not appear in the designated place as specified by the Agreement.  (Barton Aff., Ex. J at 284-85, Docket No. 214.)  ADT policy requires that any additions or deletions from a contract must be reduced to writing, but Dosse did not obtain any written approval from Lee when he altered Crickenberger's original design with regard to the security system.

However, the Agreement includes an explicit integration clause which provides, in part, that "THIS CONTRACT CONSTITUTES OUR ENTIRE AGREEMENT." (*Id.*, Ex. K at ADT000003.) Absent fraudulent inducement, which might void a contract, an integration clause generally "establishes that the parties intended the writing to be an integration of their agreement." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003).

Counterclaimants' reliance on *C-N-P Nw., Ltd. v. Sonitrol Corp.*, No. 06-CV-2516, 2008 WL 251816 (D. Minn. Jan. 29, 2008), in which a security company failed to install a cellular back up device as it had promised, is misplaced. Not only did the court in *C-N-P* not identify a similar integration clause, it was undisputed the security company had not installed the device. *Id.* at *2; *see also Rothstein v. Honeywell, Inc.*, 519 So. 2d 1020, 1020 (Fla. App. 1987) (purchaser of security system not bound by exculpatory clause in contract where company failed to install the system as promised). Here, the agreed upon devices — including a TG-4 and glass break detector — were indisputably installed in Lee's home; the parties dispute whether they were installed appropriately, correctly, and as Lee intended.

In addition, the signed documents in *C-N-P* and *Rothstein* included clauses indicating that **the entire contract** was not enforceable until installation had been completed. *C-N-P*, 2008 WL 251816, at *1; *see also Rothstein*, 519 So. 2d at 1021. By contrast, the Agreement signed by Lee provides that ADT's "alarm monitoring and notification **services will begin** when the equipment is installed and is operational and when the necessary communications connection is completed." (Barton Aff., Ex. K at

ADT000003, Docket No. 214 (emphasis added).)   Counterclaimants' arguments regarding the flaws of the installation of the security system are not grounds for arguing that the Agreement itself was not complete given the explicit integration clause.

In addition, counterclaimants point to several inconsistencies between the Administration copy of the Agreement and the photocopy of the Customer copy that Crickenberger gave to Lee.  (*See* Barton Aff., Exs. K, N, Docket No. 214.)  A charge for "Annual Recurring Municipal Fee," for example, appears on the Administration copy, but not on Lee's copy.  (*Id.*)  The "Estimated Start Date" and "Estimated Completion Date" are only identified on the Administration copy.  (*Id.*)  According to counterclaimants' expert forensic document examiner, numerous different pens were used to complete the Administration copy of the Agreement.[12]  (Aff. of Karen S. Runyon, July 7, 2009, Ex. A ("Runyon Report") at 7, Docket No. 216.)

However, there appears to be no material dispute that both Lee and ADT expected ADT's services to commence immediately.  Counterclaimants' citation to the "Annual Recurring Municipal Fee" is similarly unavailing; neither party has suggested any disagreement about the amount owed or paid to ADT as of the date of the Agreement.

Accordingly, the Court will not void the Agreement on the grounds of integration or incompletion.

---

[12] Counterclaimants have also raised questions regarding the authenticity of Hawkinson's signature on the Administration copy.  (*Id.* at 6.)  However, since Lee was ADT's customer, and her signature is unchallenged, the potential inauthenticity of Hawkinson's signature is immaterial.

### 3.     Consumer Protection Statutes

Counterclaimants also claim that the Estate effectively voided the Agreement after ADT violated certain consumer protection statutes.  Specifically, Count Fifteen of the Estate's Counterclaim (Docket No. 181) and Count Nine of the Trustee and children's Counterclaim (Docket No. 12) allege violations of 16 C.F.R. §§ 429.0-429.2 and Minn. Stat. §§ 325G.06-325G.11, regarding home sales.

According to counterclaimants, Crickenberger violated the Federal Trade Commission's rule requiring him to furnish Lee a "fully completed . . . copy" of the Agreement.  16 C.F.R. § 429.1(a).  Crickenberger was also required to offer Lee three business days to cancel the Agreement, *see id.* at § 429.1(b), but the separate Notice of Cancellation form improperly reflected a cancellation date only two business days from the date the Agreement was signed.  (Barton Aff., Ex. U, Docket No. 214 (filed under seal).)

A buyer may cancel a door-to-door sale by notification until the seller has complied with these requirements, *see* Minn. Stat. § 325G.08, subd. 2, and courts have voided contracts on sellers' failure to comply with analogous cancellation notification statutes.  *See, e.g.*, *Pope v. Rollins Protective Servs. Co.*, 703 F.2d 197, 206 (5th Cir. 1983).  Section 325G.08 does not contain a time limitation on when an individual can cancel a contract.  On July 3, 2007, Swenson, acting as a representative of the Estate, invoked her right to cancel the sale under these provisions.  (*Id.*, Ex. Z.)

As an initial matter, Minnesota's statute provides that the buyer may cancel the sale only based on the seller's failure to provide proper notification of cancellation, not

based on the seller's failure to provide an adequate copy of the contract.  The Court is not persuaded, moreover, that the provisions requiring cancellation notification warrant rescission in these circumstances.  Although Crickenberger miscalculated or misstated the date on the Notice of Cancellation form, the Agreement itself clearly provides, directly below the signature line:  "**NOTICE OF CANCELLATION**.  YOU, THE CUSTOMER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO THE END OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION."[13]  (*Id.*, Ex. K at ADT000024 (emphasis in original).)

Counterclaimants cite no caselaw in support of the proposition that a miscalculation on the cancellation date can serve to void a door-to-door sale **nearly one year later** where the proper three-day notice appears prominently on the contract. Moreover, there is no evidence suggesting that Lee ever wanted to cancel the Agreement; to the contrary, record evidence suggests she desperately wanted the security system and relied on it for her safety.  *See Cohler v. Smith*, 158 N.W.2d 574, 579 (Minn. 1968) (finding acceptance of benefit of a contract consistent with a waiver of the right to cancel).

Counterclaimants also cite Minnesota's Consumer Credit Sales Act, *see* Minn. Stat. § 325G.16(2)(f), but fail to explain how the purchase of an ADT security system was a consumer credit sale.  *See Miller v. Colortyme, Inc.*, 518 N.W.2d 544, 547-48

---

[13]  As counterclaimants observe, ADT was required to place a cancellation notice in immediate proximity to the space reserved in the contract for the signature of the buyer **and** to furnish the buyer a separate Notice of Cancellation form.  Minn. Stat. § 325G.08, subd. 1.

(Minn. 1994) (applying the Consumer Credit Sales Act to a rent-to-own transaction); Minn. Stat. § 325G.15 subd. 2 (defining "consumer credit sale").

The Court will not void the Agreement on this basis.  As discussed below, the Court will grant summary judgment to ADT on the Trustee and children's counterclaims for violations of these particular consumer protection statutes for failure to show reliance.

### 4.      Exculpatory Provision

Assuming that a jury concludes there was no fraud warranting rescission of the Agreement, counterclaimants have also moved the Court for summary judgment on whether the exculpatory provision is void and unenforceable.

"Minnesota recognizes the validity of, but does not favor, exculpatory clauses." *Nimis v. St. Paul Turners*, 521 N.W.2d 54, 57 (Minn. Ct. App. 1994).  Such provisions "will be strictly construed against the benefited party."  *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923 (Minn. 1982).  "An exculpatory clause is unenforceable if it is ambiguous in scope, purports to release the benefited party from liability for intentional, willful or wanton acts; or contravenes public policy."  *Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783, 789 (Minn. 2005).

First, counterclaimants argue that the exculpatory provisions are ambiguous in scope and do not apply to ADT's acts and omissions prior to the execution of the Agreement.  The Court disagrees with counterclaimants' assertion that the following provision is ambiguous:

> THESE AGREED UPON DAMAGES [LIMITED TO $500] . . . ARE
> YOUR SOLE REMEDY NO MATTER HOW THE LOSS, DAMAGE,
> INJURY OR OTHER CONSEQUENCE IS CAUSED, EVEN IF CAUSED

BY OUR NEGLIGENCE, GROSS NEGLIGENCE, FAILURE TO
PERFORM DUTIES UNDER THIS CONTRACT, STRICT LIABILITY,
FAILURE TO COMPLY WITH ANY APPLICABLE LAW, OR OTHER
FAULT.

(Barton Aff., Ex. K at ADT000027, Docket No. 214.)  "A contract[ual] [provision] is

ambiguous if, based upon its language alone, it is reasonably susceptible of more than

one interpretation."  *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511,

515 (Minn. 1997).   The exculpatory clause is subject to only one reasonable

interpretation: that the agreed upon damages are Lee's sole remedy no matter how the

loss, damage, or injury was caused.   As discussed below, the cited passage is overly

**broad**, but it is devoid of **ambiguity**.

Counterclaimants' argument that the exculpatory provision does not encompass

work performed by ADT before the Agreement was signed is likewise unavailing, given

the Agreement's explicit integration clause.   Counterclaimants cite *Davis v. Protection

One Alarm Monitoring, Inc.*, 456 F. Supp. 2d 243 (D. Mass. 2006) for the proposition

that Crickenberger owed a duty to exercise due care beyond the precise boundaries of the

Agreement, but the contract for a security system in *Davis* apparently lacked an

integration clause; moreover, the court in *Davis* concluded that the plaintiffs were not

bound by the contract's provisions because they were merely employees of the company

that signed the contract.   Lee, however, is a signatory to the Agreement and is bound by

its terms, absent a showing of fraud.   "Prior negotiations of the parties are merged into

the written contract unless in the minds of both parties an independent oral contract was

intended."  *Vermes*, 251 N.W.2d at 103.

However, the Court concludes that the exculpatory provision is overbroad. Under Minnesota law, a company cannot waive liability for "willful negligence or intentional acts." *Honeywell, Inc. v. Ruby Tuesday, Inc.*, 43 F. Supp. 2d 1074, 1080 (D. Minn. 1999); *Morgan Co. v. Minn. Mining & Mfg. Co.*, 246 N.W.2d 443, 448 (Minn. 1976) (exculpatory clause inapplicable to claims of "willful and wanton negligence, intentional misconduct, and fraud and misrepresentation"). The Court denies summary judgment to ADT on the Trustee and children's claims for gross negligence and concludes that the exculpatory provision is inapplicable to such claims **even if the Agreement was not fraudulently induced and is enforceable**. "Nor can [the exculpatory provision] limit the monetary amount of [ADT]'s liability for such conduct." *Honeywell*, 43 F. Supp. 2d at 1080; *see also D.L. Lee & Sons v. ADT Sec. Sys., Mid-South, Inc.*, 916 F. Supp. 1571, 1582 (S.D. Ga.1995) ("A clause in a contract limiting liability for negligent acts does not serve to limit liability for willful or wanton conduct.").

Some courts confronting similarly overbroad exculpatory provisions do not, as counterclaimants request, conclude that the entire provision is unenforceable; rather, they limit its applicability to claims which do not implicate willful and wanton negligence or intentional behavior. *See, e.g.*, *Honeywell*, 43 F. Supp. 2d at 1080-81. Others, however, conclude that the entire exculpatory clause is inapplicable. *See, e.g.*, *Wu ex rel. Tien v. Shattuck-St. Mary's Sch.*, 393 F. Supp. 2d 831, 837-38 (D. Minn. 2005). The Court concludes that limiting, rather than entirely voiding, the provision is more reasonable. It would make little sense to conclude ADT could have exculpated itself from negligence

claims, but that by exculpating itself from claims of both negligence and gross negligence it exculpated itself from neither.

Finally, counterclaimants request that the Court conclude that the exculpatory provision is void in its entirety on public policy grounds. "In determining whether an exculpatory clause violates public policy, [courts] consider (1) whether there was a disparity in bargaining power between the parties and (2) the types of services being offered or provided, taking into consideration whether they are public or essential services." *Yang*, 701 N.W.2d at 789. With regard to the first factor, "[a] disparity of bargaining power in a liability release may exist where the services provided are necessary or unavailable elsewhere; where there is a compulsion to participate in the activity; and where there is no opportunity to negotiate the terms of the exculpatory agreement." *Beehner v. Cragun Corp.*, 636 N.W.2d 821, 827 (Minn. Ct. App. 2001).

Lee was arguably compelled to "participate in the activity" offered by ADT out of fear for her safety, and it does appear that Lee was not provided a significant opportunity to negotiate the terms of the exculpatory provision. The Agreement provides: "AT YOUR REQUEST, WE MAY ASSUME ADDITIONAL LIABILITY BY ATTACHING AN AMENDMENT TO THIS CONTRACT STATING THE EXTENT OF OUR ADDITIONAL LIABILITY AND THE ADDITIONAL COST TO YOU." (Barton Aff., Ex. K at ADT000027, Docket No. 214.) However, this provision was in small print, in the middle of the sixth of twenty eight "important terms and conditions." (*Id.*) Lee reviewed the Agreement with Crickenberger on the hood of a car in an interaction lasting approximately five to ten minutes. (*Id.*, Ex. B at 220.) There is no evidence that

Crickenberger reviewed the exculpatory provision with Lee, or that ADT has ever negotiated the terms of the provision with a residential customer.   Yet the Agreement provided for a three-day cancellation period, during which Lee had the opportunity to review the terms of the Agreement and reject them if she so chose.

Moreover, "[p]roof that [Lee] had no opportunity to negotiate the terms of the exculpatory agreement is not enough to show a disparity of bargaining power.  [She] also ha[s] to show that [ADT]'s services could not be obtained elsewhere."  *Malecha v. St. Croix Valley Skydiving Club, Inc.*, 392 N.W.2d 727, 730 (Minn. Ct. App. 1986); *see also Schlobohm*, 326 N.W.2d at 925.  Lee clearly cannot make this showing; ADT was one of numerous other security system providers competing for business from potential customers such as Lee.[14]

With regard to the second prong of the public policy analysis, "courts consider whether [the service provided by the party seeking exculpation is] . . . the type [of service] generally thought suitable for public regulation[,]" such as "common carriers, hospitals and doctors, public utilities, innkeepers, public warehousemen, employers and services involving extra-hazardous activities."  *Schlobohm*, 326 N.W.2d at 923.  The Court may consider whether ADT "offered services of great importance to the public, which were a practical necessity for some members of the public."  *Id.* at 926.

---

[14]  Lee argues that security services free of similar exculpatory provisions were unavailable elsewhere, as other residential security service providers impose similar conditions in their contracts.  (Barton Aff., Ex. AA, Docket No. 214.)  She cites no case, however, addressing circumstances in which a court considered not only the availability of similar services elsewhere but also whether those outside services also compelled customers to agree to similar exculpatory provisions.

ADT is subject to state regulation under the Minnesota Electrical Act and numerous safety standards. *See* Minn. Stat. §§ 326B.31-326B.399. (Barton Aff., Ex. E at ADT7839, Docket No. 214.) Its services were arguably a practical necessity for Lee and other homeowners in grave danger of attack. The essential nature of the services proved dispositive in *Yang*, a case concerning a houseboat renter and his vacationing party who suffered carbon monoxide poisoning on board and subsequently sued the houseboat rental company. 701 N.W.2d at 789. The Minnesota Supreme Court considered the houseboat rental company an "innkeeper" which owed "a duty to take reasonable action to protect [its] guests." *Id.* at 790. Relying on long-established precedent and treatises holding that innkeepers may not "contract away liability for negligence[,]" the court concluded that the exculpatory provision in the houseboat rental agreement was contrary to public policy and unenforceable. *Id.* at 791 (quotation marks omitted).

Counterclaimants' briefs are devoid of precedent, like in *Yang*, regarding the obligations of security companies. To the contrary, Minnesota courts consistently conclude that security service companies such as ADT may contract to relieve themselves of liability for negligence, though not for gross negligence or intentional acts. *See, e.g.*, *Honeywell*, 43 F. Supp. 2d at1079-80; (D. Minn. 1999); *Morgan Co.*, 246 N.W.2d at 447 ("Provisions limiting liability and the amount of damages under burglar alarm service agreements . . . have been uniformly upheld . . . ."); *see also Peterson v. Honeywell, Inc.*, No. C2-93-1795, 1994 WL 34200, at *4 (Minn. Ct. App. Feb. 8, 1994).

Indeed, Lee cites no court in **any** jurisdiction which concluded that a clause in a contract for alarm services relieving the service provider of liability for negligent acts was contrary to public policy. *Cf. Leon's Bakery, Inc.*, 990 F.2d at 48-49 ("[C]ourts [across the country] have . . . upheld clauses limiting liability for the failure of such [security] systems . . . . [m]ost persons, especially operators of business establishments, carry insurance for loss due to various types of crime. . . .   No reasonable person could expect that the provider of an alarm service would, for a fee unrelated to the value of the property, undertake to provide an identical type coverage should the alarm fail to prevent a crime." (internal quotation marks omitted)).   Accordingly, the Court declines to void the exculpatory provision on public policy grounds.

### 5.    Applicability of Contractual Limitations on Claims of Trustee and Children

The parties dispute whether the Trustee and children are bound by the terms of the Agreement, assuming it is not voided on the ground of fraud.  Counterclaimants request that the Court conclude that the exculpatory provision of the Agreement is inapplicable to the claims of the Trustee and the children since they were not parties to the Agreement.

Minnesota's wrongful death statute makes clear that the Trustee's authority to file suit is measured by that of the decedent at the time she died.  Minn. Stat. § 573.02, subd. 1 ("When death is caused by the wrongful act or omission of any person or corporation, the trustee appointed as provided in subdivision 3 may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an

injury caused by the wrongful act or omission.").  The Court therefore concludes that the Trustee is bound by the Agreement.

The children, however, are separate people than their mother, and they did not sign the Agreement.  Courts have sometimes concluded that individuals who were not signatories to an alarm system contract, such as employees suing a security services company which executed a contract with his employer, are consequently not bound by its terms.  *See, e.g.*, *Davis,* 456 F. Supp. 2d at 255 ("As with other types of contracts, a plaintiff who is not a party to an alarm security contract, and never consented to its terms, cannot be bound by its limitation of damages clause."); *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 493 N.E.2d 1022 (Ill. 1986) (tenants harmed by a fire caused by negligence of neighbor's fire alarm company could maintain tort action against company despite exculpatory provision limiting company's liability in actions brought by neighbor and possibly others located on the neighbor's premises); *Young v. Tri-Etch, Inc.*, 790 N.E.2d 456, 459 (Ind. 2003) ("Since [the employee] was not a party to the contract, and thus never consented to the terms of the contract, the contract simply does not impose any obligations or limitations on him.").

However, numerous courts have enforced clauses limiting the liability of alarm companies against individuals who were not parties to the contracts.  *See, e.g.*, *N. River Ins. Co. v. Jones*, 655 N.E.2d 987, 993 (Ill. Ct. App. 1995) ("[The security company's] duty and limitation on its liability under the Contract relate to the specific premises and the property thereon regardless of who may have legal title to the premises or the property located on the premises."); *Fretwell v. Protection Alarm Co.*, 764 P.2d 149, 150-

51 (Okl. 1988) ("Even though [plaintiffs] are third-party beneficiaries to the contract, the contract which established the duty to [them] may also limit the liability of the promissor since the consideration for the contract was set with these limitations in the contemplation of the parties to the agreement.").

The Court concludes that the latter jurisprudence contains more persuasive reasoning. Assuming that the Agreement was not fraudulently induced, ADT's obligations and duties in this case generally arose from the Agreement, which contains an explicit integration clause. Accordingly,

> any obligation which ADT owes to third persons must derive from the contract between ADT and [Lee]. The contractual limitations on ADT's liability to [Lee] and other parties limit its duty to the [children] under § 324A. Since ADT's contract specifically states that ADT could not be held liable for damages caused by it, no duty was assumed under the contract, and therefore, no duty can be imposed under [Restatement of Torts (Second)] § 324A [regarding liability to a third person injured as a result of a defendant's negligent performance of an undertaking to perform services for another]. Without a contractual basis for imposing a duty under § 324A, [the children] cannot recover from ADT under this theory . . . .

*Allendale Mut. Ins. Co. v. Leaseway Warehouse, Inc.*, 624 F. Supp. 637, 641 (N.D. Ill. 1985); *see also Krueger Assocs., Inc. v. ADT Sec. Sys.*, No. 93-1040, 1996 WL 560335, at *10 (E.D. Pa. Oct. 2, 1996) ("It is clear that under the ADT/Holmes Contract, **it was ADT's intention to limit its liability to any party** . . . . As such, Plaintiff's claims of negligence against Defendants necessarily fail. Any other interpretation would lead to **the anomalous result of allowing Plaintiff, who paid nothing to the Defendant for alarm services, to enjoy more expansive rights than the subscriber** . . . ." (emphasis added)).

Counterclaimants argue that the children cannot be bound by the Agreement for the additional reason that, under Minnesota law, minor settlements require court approval.  Minn. Stat. § 573.02.  However, when Lee signed the Agreement she was contracting for security services, not signing a minor settlement.  ADT's duties in this case arise from that transaction.  The Court concludes that the Trustee and children's claims rise or fall with the Estate's.  If a jury decides that the Agreement was not fraudulently induced, then all counterclaimants should be limited to tort claims arising from ADT's alleged gross negligence.  If a jury concludes that the Agreement should be held invalid and unenforceable, then most[15] of counterclaimants' counterclaims sounding in tort should stand.[16]

---

[15] As discussed below, regardless of the enforceability of the Agreement, ADT is entitled to summary judgment on the counterclaims for violation of various consumer protection statutes and the False Statement in Advertising Act.

[16] ADT seems to argue that even if the Agreement is voided as fraudulently induced, under relevant Minnesota precedent it still cannot be held liable in tort.  It argues that the negligence claims "are nothing more than breach of contract claims dressed in tort clothing." (ADT's Mem. in Support at 25, Docket No. 208.)  Although it is not permitted to exculpate itself contractually from claims of gross negligence, ADT is generally not liable in tort for breach of **contractual duties**.  *See C-N-P*, 2008 WL 251816, at *8 ("Plaintiffs have failed to cite to any Minnesota case where a party has been held liable in tort, pursuant to the Restatement for failing to perform the services it agreed to perform in a contract. . . ."); *Vermes*, 251 N.W.2d at 103.

However, the cases cited by ADT for the proposition that all of counterclaimants' tort claims are foreclosed because they derive from contractual duties involve contracts **not voided by fraud**.  *See, e.g., Spengler v. ADT Sec. Servs., Inc.*, 505 F.3d 456, 457-58 (6th Cir. 2007); *Vermes*, 251 N.W.2d at 103; *Banzhaf v. ADT Sec. Sys. Sw., Inc.*, 28 S.W.3d 180, 186 (Tex. Ct. App. 2000).  While "Minnesota courts have not recognized a cause of action in tort for breach of a contractual duty," *C-N-P*, 2008 WL 251816, at *8, if a jury concludes that the Agreement is void on grounds of fraud, then no explicit contractual duty exists.  The Court sees no bar to most of counterclaimants' tort claims in those circumstances.  ADT's other arguments challenging counterclaimants' tort claims, issues severable from whether the Agreement is enforceable, are considered below.

### 6.    Indemnification Provision

Counterclaimants also ask the Court to find the indemnification provision in the Agreement unenforceable under Minnesota law pertaining to "building and construction" contracts.  Minn. Stat. §§ 337.01, subd. 2, 337.02.  However, the cited provisions are only applicable to contracts for improvements which are improvements to real property. *Lederman v. Cragun's Pine Beach Resort*, 247 F.3d 812, 816 (8th Cir. 2001). Counterclaimants cite no Minnesota precedent in support of the proposition that a security system is an improvement within the meaning of those statutes.   The Court declines to find the indemnification provision unenforceable; in any event, ADT does not rely upon this provision in its arguments in support of summary judgment.

### 7.    Warranty Claims

Counterclaimants concede that their warranty claims (Estate's Counts 16 and 17; Trustee's and children's Counts 10 and 11), including claims for the implied warranty of merchantability, fail if the Agreement is valid and enforceable.  The Agreement provides for a ninety-day limited warranty to Lee to repair or replace any defective part of the security system, including wiring.  (Barton Aff., Ex. K at ADT000027, Docket No. 214.) Lee also purchased an extended limited warranty/quality service plan.  (Answer to Trustee's Countercls., ¶ 387, Docket No. 203 (filed under seal).)   The Agreement expressly disavows any other warranty other than the limited warranty.  (Barton Aff., Ex. K at ADT000027, Docket No. 214.)

Counterclaimants, however, have pled, in the alternative, breach of the express limited warranty in the Agreement.   (Estate's Count 21; Trustee and children's Count 15.)   The Court concludes that if the Agreement is upheld, these claims survive, although they would be subject to the Agreement's $500 limitation of liability provision. Accordingly, if the Agreement is upheld, the Estate's Counts 16 and 17 and the Trustee and children's Counts 10 and 11 fail, but the Estate's Count 21 and Trustee and children's Count 15 survive.   If the Agreement is voided as fraudulently induced, the Estate's Count 21 and the Trustee and children's Count 15 must be dismissed, but all other warranty claims survive.   Because genuine issues of material fact exist with regard to the enforceability of the Agreement, the Court denies summary judgment on all warranty claims.

## C.      Additional Grounds for Summary Judgment

ADT asserts numerous other grounds for summary judgment which are generally severable from the question of whether the Agreement is valid and enforceable.

### 1.      No Greater Harm

ADT argues that counterclaimants cannot establish negligence because its alleged failures did not increase the risk of harm over what it would have been had ADT not undertaken to sell and implement a security system.   *See Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994) ("The test [of negligence under the Restatement (Second) of Torts § 324A] is not whether the risk was increased over what it would have been if the

defendant had not been negligent.  Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all.").

Counterclaimants, however, have alleged, and a jury could infer from the evidence presented, that Lee was lured into a false sense of security by presuming that ADT had installed a security system that would provide audible notice when Van Keuren cut the telephone wires and broke into the home.  Before the alarm system was installed, Lee had not felt safe living in her home.  Testimony from Lee's coworkers, family, and friends indicates that she bought the security system for the purpose of finally feeling secure in her home.  Accordingly, the Court will not grant summary judgment to ADT on any claim on this ground.

## 2.     Causation

Tort plaintiffs generally must prove that the breach of a duty of care was the proximate cause of the alleged injury.  *Louis v. Louis*, 636 N.W.2d 314, 318 (Minn. 2001).  ADT asserts that it is entitled to summary judgment on all of counterclaimants' tort claims because they cannot establish that ADT's alleged conduct was the proximate cause of Lee's death.

Under Minnesota law,

[t]here is proximate cause between a negligent act and an injury when the act is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others.  A plaintiff must also show that the negligent conduct was a substantial factor in bringing about the injury.

*Lietz v. N. States Power Co.*, 718 N.W.2d 865, 872 (Minn. 2006) (citations and quotation marks omitted).  "A plaintiff need only demonstrate **a plausible causal linkage** between

a breach of duty and his or her injuries to allow a claim of negligence to be presented to a jury." *Jonathan v. Kvaal*, 403 N.W.2d 256, 260 (Minn. App. 1987) (quotation marks omitted, emphasis added).  Accordingly, "the existence of proximate cause is usually a question of fact for the jury, [unless] . . . reasonable minds could reach only one conclusion . . . ." *Lietz*, 718 N.W.2d at 872 (quotation marks omitted).

In this case, counterclaimants have proffered sufficient evidence to demonstrate a plausible causal linkage between ADT's alleged negligence and their injuries. Specifically, a jury could find that:

- Lee sought a security system for the specific threat posed by Van Keuren, and specifically for the purpose of notification of his entry;

- ADT represented to Lee and Hawkinson that an audible alarm would sound when the telephone lines were cut and when an intruder broke into the house;

- Hawkinson, a hunter who carried a gun on his person and slept near it, was prepared and willing to shoot Van Keuren in defense;

- Van Keuren did not know about Hawkinson or about the existence of an alarm system in the house;

- Van Keuren had indicated his willingness to abort a lethal mission previously;

- Van Keuren exhibited indecisiveness about whether to kill Lee on the night of the murders;

- Van Keuren first cut the telephone lines on the side of the house, then moved "slowly" to the back of the house where he broke the basement glass door with a crowbar, cleared the glass, and then moved through the house and up the stairs;

- Because the system was incorrectly and inappropriately installed, no alarm sounded after any of these actions, indeed, until after the murders.

From these and other facts, a jury could reasonably infer that with appropriate stimuli, including a loud blaring alarm, Van Keuren may have reconsidered his mission on September 22, 2006, or that an audible alarm would have given the occupants an opportunity to hide, call for help, or, in Hawkinson's case, repel Van Keuren.

There is, of course, also substantial evidence undermining these conclusions. To offer but one example, Van Keuren testified that nothing would have prevented him from carrying out the murders. The question before the Court, however, is whether this is a case in which reasonable minds could only reach the conclusion that ADT's actions did not proximately cause counterclaimants' injuries. Plainly, it is not.

ADT argues, both in its summary judgment motion and in its motion to exclude the testimony of various experts and other witnesses, that counterclaimants cannot establish causation because they "have no expert who can opine as to how Tim Hawkinson, Sr. would have responded during an encounter with Van Keuren, or who can say what, if anything, would have prevented this tragedy." (Mem. in Supp. of Consolidated Mot. for Summ. J. at 31, Docket No. 208.) The Court's determination that counterclaimants have proffered evidence of causation to sustain their tort claims, however, is made **without regard to any expert testimony**. The facts, inferences, and conclusions set forth above are well within the province of a jury to find without the benefit of expert testimony. While expert testimony may be helpful in illuminating certain areas in this case such as the functioning of the security system's components, it is

not **necessary** for counterclaimants to proffer any expert to prove that ADT proximate caused their injuries in these circumstances.

Summary judgment is not warranted on the ground of failure to establish causation.

### 3.    Strict Liability Claims

The Trustee and children assert two strict liability design claims against ADT (Counts 4 and 5), alleging that the security system was designed, allegedly installed, programmed, tested, and inspected by ADT in a defective condition unreasonably dangerous for its intended use.[17]   The claims are premised on the interaction between Lee's VOIP and Telular TG-4, as well as the glass break detectors.   ADT argues that these claims must fail because it does not manufacture or design the three products on which the strict liability claims are based.   (Aff. of Charles C. Eblen, March 26, 2010, Ex. E  ¶¶ 4-6, Docket No. 209.)   Rather, ADT purchases such devices from other companies and installs them in residences and businesses to provide a security service. (*Id.* ¶ 3.)

The Trustee and children do not seem to dispute ADT's contention that only the manufacturer of a product is subject to strict liability based on the product's defective design.   *See* 4A Minn. Prac. CIVJIG 75.20 (5th ed.).   "A manufacturer is '[a]ny individual, partnership, corporation, . . . which manufactures, **assembles**, or produces

---

[17] They also assert strict liability based on ADT's alleged failure to warn (Count 7).  ADT does not seem to have challenged this claim on any ground other than the enforceability of the exculpatory provision in the Agreement.

goods.'"  *Grudnoske v. Determan Welding & Tank Serv., Inc.*, No. C3-99-359, 1999 WL 690194, at *2 (Minn. Ct. App. Sept. 7, 1999) (alteration and omission original) (emphasis added) (quoting Black's Law Dictionary 965 (6th ed. 1990)).

A review of the counterclaims, however, makes clear that they do not allege any defect in the component parts of the security system (i.e. the TG-4 unit itself), but rather ADT's assemblage of the security system's component parts.  "**An assemblage of component parts is also, itself, a product**."  Restatement (Third) of Torts: Product Liability § 19(a), cmt. b (emphasis added).  Indeed,

> [w]hile the law of design defect clearly extends liability to finished product manufacturers . . . , it rarely imposes strict liability on component part suppliers who merely sell their multi-use parts to manufacturers of finished products. . . .  If . . . the finished product was unreasonably dangerous **because the component part was unsuited for the particular use that the finished product manufacturer chose to make of it, then the defect is in the design of the finished product rather than in the design of the component part**.  In these cases, it is the finished product manufacturer and not the component part supplier that may be held strictly liable.

*In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1056 (8th Cir. 1996) (emphasis added).  Accordingly, if the Agreement is void, ADT may be held liable as a finished product manufacturer.

Moreover, ADT is not entitled to summary judgment on the strict liability claims because it failed to comply with Minnesota's seller's exception statute, which provides that a non-manufacturer sued for strict liability "shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing injury, death or damage."  Minn. Stat. § 544.41, subd. 1.  The strict liability claim against the "certifying defendant" may be dismissed only after the plaintiff

has filed a complaint against the actual manufacturer.  *Id.* subd. 2.  "The plain language of the seller's-exception statute requires that the identified manufacturer be **served with process** prior to dismissal of strict-liability claims against the passive seller.   And it further requires that, before dismissal, the manufacturer must have responded or have the obligation to respond."  *In re Shigellosis Litig.*, 647 N.W.2d 1, 7 (Minn. Ct. App. 2002) (emphasis original) (citation omitted).

Not only did ADT not comply with the prerequisite process for escaping liability as a passive seller under Minnesota law, the statute provides that a court may not dismiss any certifying defendant where the plaintiff can establish that it "exercised some significant control over the design or manufacture of the product . . . ."  Minn. Stat. § 544.41, subd. 3(a).  Viewing the facts in the light most favorable to counterclaimants, ADT exercised at least some significant control over the manufacture of the product; indeed, counterclaimants allege that it was solely ADT which created the defect in the product.   Accordingly, the Court denies ADT's motion for summary judgment on the strict liability claims.

### 4.      Public Benefit

Counterclaimants have brought numerous claims pursuant to various consumer protection statutes under Minnesota law: Minn. Stat. §§ 325G.06-.11, governing home solicitation sales; Minn. Stat. §§ 325F.68-70, which prohibits unlawful and deceptive sales practices; Minn. Stat. § 325F.67, which prohibits false statements in advertising; and  Minn. Stat. § 325D.13, which prohibits unlawful trade practices including

misrepresentations about the quality of marketed merchandise. (Trustee and children's Counterclaims 9, 12, 13, and 14; Estate's Counterclaims 15, 18, 19, and 20.)

While these statutes do not afford counterclaimants a private right of action, they are permitted to enforce them pursuant to Minnesota's Private Attorney General Statute, Minn. Stat. § 8.31, subd. 3a, as long as they "demonstrate that their cause of action benefits the public." *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000). ADT argues that the consumer protection claims asserted by counterclaimants fail as a matter of law; since counterclaimants seek only damages and not injunctive relief, ADT argues, their counterclaims confer no public benefit. Moreover, ADT cites Minnesota's wrongful death statute, Minn. Stat. § 573.02, subd. 1, which states that "[t]he recovery in [a wrongful death] action is the amount the jury deems fair and just in reference to the pecuniary loss resulting from the death, and shall be for the **exclusive** benefit of the surviving spouse and next of kin . . . ." (Emphasis added.)

The Court has previously considered and dismissed these arguments, at length, twice. *See ADT Sec. Servs., Inc. v. Swenson, ex rel. Estate of Lee*, 687 F. Supp. 2d 884, 891-92 (D. Minn. 2009); *ADT Sec. Servs., Inc. v. Swenson*, No. 07-2983, 2008 WL 2828867, at *4-8 (D. Minn. July 21, 2008) (dismissing without prejudice consumer protection counterclaims for Rule 9 pleading deficiencies but explaining that "this Court is not persuaded that Minnesota's Private Attorney General Statute incorporates the bright-line rule suggested by plaintiff, requiring that equitable relief must be requested in order for a claimant to seek a 'public benefit.'"). As the Court made explicit in its order denying ADT's motion to dismiss counterclaims under these consumer protection

statutes, counterclaimants do not need to seek equitable relief in order to establish a "public benefit" under the Private Attorney General Statute. *ADT*, 687 F. Supp. 2d at 891. In that order, the Court explained that it "will be open to revisiting this issue at summary judgment **if the evidence demonstrates that the improprieties here were isolated and unconnected to ADT's national sales and installation practices** . . . ." *Id.* at 892 (emphasis added).

ADT has not attempted to make such a showing in the instant motion. To the contrary, there is record evidence suggesting that ADT represents to customers that its security system will produce an audible alarm if an intruder cuts the customer's telephone lines, but that ADT's policy is not to monitor telephone line faults and not to set its cellular devices to sound an alarm in the event of a line failure. (*See, e.g.*, Barton Aff., Ex. B at 72, 118-19; Ex. D at 70-72; Ex. E at ADT002934; Ex. I at 15-18, Docket No. 214.) There is also record evidence suggesting that ADT promotes its cellular devices as maintaining connectivity to ADT in the event of cut telephone lines, that ADT knows of connectivity issues related to VOIP, but that it is insufficiently addressing those issues as evidenced by the failure at the Lee residence. ADT represents that it has explained to the customer the full range of equipment and services available, but there is evidence that ADT does not in fact do so. (Barton Aff., Ex. X at 64-65, Docket No. 249.)

The Court denies summary judgment to ADT on this ground and refers the parties to the discussions of the Private Attorney General Statute in its previous orders in this case.

### 5.    Reliance

ADT argues that it is entitled to summary judgment on counterclaimants' claims under Minnesota's consumer protection statutes, as well as on their claims of fraud and misrepresentation, for failure to establish reliance.  *Flynn v. Am. Home Prods. Corp.*, 627 N.W.2d 342, 351 (Minn. Ct. App. 2001) (recovery of damages under Minnesota's Private Attorney General Statute requires "a causal nexus between the alleged injury and the wrongful conduct . . . [that] includes a reliance component that may be proven by direct or circumstantial evidence" (quotation marks and citations omitted)); *Vogt*, 418 N.W.2d at 538 (misrepresentation requires showing of reliance).

The Court concludes that the same evidence of reliance supporting the Estate's fraud claims, discussed above, similarly supports the claims of unlawful and deceptive sales practices and unlawful trade practices including misrepresentations about the quality of marketed merchandise.  Unlike the "vague and conclusory" statements made in *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 924 (8th Cir. 2004), cited by ADT, Swenson's sister testified about specific impressions her sister had regarding her ADT security system.  The Court therefore denies summary judgment to ADT on the Trustee and children's Counterclaims 12 and 14 and the Estate's Counterclaims 18 and 20.

The false advertising claim, however, must be dismissed.   The ADT brochure appears to be the only evidence of any "advertisement" proffered by counterclaimants which a jury could infer that Lee viewed.  *See* Minn. Stat. § 325F.67.  However, the Magistrate Judge concluded in his unappealed sealed order regarding punitive damages that there is no evidence that Lee viewed, let alone relied upon, the brochure.  (Sealed

Order at 11, Docket No. 165.)  Discovery concluded in this case several months before counterclaimants moved to amend their counterclaim to add a claim for punitive damages; counterclaimants have no more evidence available to them in connection with the instant motions than they did in connection with the punitive damages motion.

Further, counterclaimants have cited no evidence of reliance as to their claims regarding home solicitation sales, nor have they established how ADT's alleged violations of these provisions led to their injuries.  *See* Minn. Stat. § 8.31, subd. 3a (standing to "any person **injured**" by a violation of the relevant provisions (emphasis added)).  Accordingly, the Court grants summary judgment to ADT on the Trustee and children's Counterclaims 9 and 15, and the Estate's Counterclaims 13 and 19.

### 6.    Payments Made by Hawkinson

ADT argues that all of the Estate's claims fail because any recovery is limited to the reimbursement of expenses paid to ADT, *ADT*, 687 F. Supp. 2d at 890 ("Lee's estate cannot use its claims as a vehicle to seek damages arising out of Lee's death" but can seek to recover payments for the security system), and Hawkinson – not Lee – paid those expenses.  In the Court's previous order, it considered that prospect and suggested that the Estate's claim would appear to be moot in those circumstances.  *Id.* at 890 n.3.  The Court, however, explicitly declined to rule on the matter.  *Id.*  ("This issue extends beyond the pleadings, however, and is not something this Court is free to take up in the context of a motion to dismiss.").

With the benefit of a full evidentiary record and briefing on this issue before it, the Court will not dismiss all of the Estate's claims because Hawkinson paid for the security

system.  As discussed above in the context of the Estate's ability to establish pecuniary damage necessary to prove fraud, counterclaimants have presented substantial evidence that Hawkinson intended the payment to be a gift.  Moreover, questions of donative intent are generally factual, precluding the issuance of summary judgment.  *See Olsen v. Olsen*, 562 N.W.2d 797, 800 (Minn. 1997).

### 7.    Punitive Damages

Finally, ADT argues that counterclaimants' punitive damages claims fail as a matter of law because they are unsubstantiated by record evidence.  As determined by the unchallenged order by the Magistrate Judge, counterclaimants' punitive damages claims are limited to the Estate's common law fraud and misrepresentation by omission claims, and the Trustee's strict liability claims based on design.

Minnesota's punitive damages statute requires "clear and convincing evidence" that ADT's acts show a "deliberate disregard for the rights or safety of others."  Minn. Stat. § 549.20, subd. 1(a).  Deliberate disregard exists where

> the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and: (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

*Id.*, subd. 1(b).

Counterclaimants' evidence, if believed by a jury, amply meets this standard.  For example, counterclaimants have proffered evidence that:

- ADT represented to its customers, including Lee, that an audible alarm would sound if the telephone wires were cut;

- ADT represented to is customers, including Lee, that the TG-4 unit would retain the system's connectivity if the telephone wires were cut;

- ADT was aware of connectivity issues regarding VOIP and the TG-4;

- ADT represented to Lee that it had offered the full range of services available to her;

- ADT's representatives knew of Lee and Hawkinson's concerns about the telephone lines;

- Crickenberger was aware of Van Keuren's prior attack, and knew that the ADT security system was intended to deter such an attack or provide notice of his entry;

- Crickenberger designed the system to include glass break detection on the basement door;

- Crickenberger recommended the TG-4 unit despite knowing that the feature triggering an audible alarm upon the cutting of the telephone lines would be disabled;

- Dosse failed to properly install the security system, including the TG-4;

- Dosse failed to properly test the security system;

- Dosse did not place a glass break detector on the basement door; and

- ADT representatives did not suggest that Lee add additional glass break detection in the basement area after learning that there was no glass break detector on the basement door.

ADT points to its contrary evidence undermining counterclaimants' contention, including Crickenberger's testimony that he explicitly told Lee and Hawkinson that no alarm would sound.   The question, however, is whether a jury could believe counterclaimants' version of events.  The Court concludes that one could.

### D.    ADT's Motion for Summary Judgment Regarding Comparative Fault

ADT moves the Court to hold as a matter of law that the police departments are liable for Lee's murder, and to compel a jury to assess a proportionate percentage of fault to them.   *See* Minn. Stat. § 604.02 ("When two or more persons are severally liable, contributions to awards shall be in proportion to the percentage of fault attributable to each, except that . . . a person whose fault is greater than 50 percent . . . [is] jointly and severally liable for the whole award . . . .") (quotation reordered); Restatement (Third) of Torts: Apportionment of Liability § 14 ("A person who is liable to another based on a failure to protect the other from the specific risk of an intentional tort is jointly and severally liable for the share of comparative responsibility assigned to the intentional tortfeasor in addition to the share of comparative responsibility assigned to the person.").[18]

ADT argues that the police departments' failure to arrest Van Keuren constituted negligence *per se* based on Minn. Stat. § 518B.01, subd. 22(c) (2006), which provides:

> A peace officer shall arrest without a warrant and take into custody a person whom the peace officer has probable cause to believe has violated a domestic abuse no contact order, even if the violation of the order did not

---

[18] The Court previously denied ADT's motion requesting an apportionment of fault between ADT and Van Keuren.  *See ADT*, 687 F. Supp. 2d at 894.

take place in the presence of the peace officer, if the existence of the order can be verified by the officer.  The person shall be held in custody for at least 36 hours, excluding the day of arrest, Sundays, and holidays, unless the person is released earlier by a judge or judicial officer.  A peace officer acting in good faith and exercising due care in making an arrest pursuant to this paragraph is immune from civil liability that might result from the officer's actions.

The statute, however, does not prescribe any time frame within which a peace officer must make the arrest after learning of the violation of a no contact order, nor does it mandate the manner in which such an arrest must be made.

The police departments cannot be held jointly and severally liable with ADT unless they are liable themselves, *see* Minn. Stat. § 604.01, subd. 1a (defining "fault"), and record evidence clearly establishes that the Washington County Sheriff's Office is not.  With regard to Lee's report of the email message and suspicious phone calls, Investigator Reiter, acting on behalf of the Washington County Sheriff's Office, reasonably concluded that there was not probable cause to believe Van Keuren had violated the no contact order.  Dick Van Keuren assumed responsibility for sending the email message, and it was impossible to determine who had made the suspicious phone calls to Lee; the only traceable call originated in a gas station.  Section 518B.01 only requires the police departments to act on probable cause.  Accordingly, the Court concludes that there is no record evidence to support a finding that the Washington County Sheriff's Office bears any liability for Lee's murder and will deny ADT's summary judgment motion in that regard.

Officer Zilge, however, on behalf of the St. Paul Park Police Department, did have probable cause to believe Van Keuren violated the no contact order following the

September 20, 2006 incident at Lee's daughter's junior high school.  He decided to issue a citation to Van Keuren, rather than attempt to effectuate his arrest immediately, based on the advice of the on-duty Assistant Washington County Attorney.  A police officer is protected by official immunity in the performance of his duties unless "[a] he fails to perform a ministerial act, or [b] when his performance of a discretionary act is willful or malicious."  *Thompson v. City of Minneapolis*, 707 N.W.2d 669, 673 (Minn. 2006).

"The 'willful [or] malicious wrong' standard contemplates whether the official has intentionally committed an act that he or she had reason to believe is prohibited."  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 482 (8th Cir. 2010) (quotation marks omitted).  "This is a subjective standard, in contrast to the objective qualified immunity standard" applicable in the context of constitutional claims.  *Id.* (quotation marks omitted).  ADT does not dispute the fact that Zilge was acting pursuant to legal advice, and offers no record evidence to suggest that he was engaged in a willful or malicious wrong.  Therefore, the Court concludes that Zilge's actions and omissions may trigger liability only if he failed to perform a "ministerial act."

A discretionary act is one necessitating "the exercise of individual judgment in carrying out the official's duties."  *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998).  "A ministerial act, in contrast, is absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts."  *Thompson*, 707 N.W.2d at 673 (quotation marks omitted).  In this case, while § 518B.01 required Zilge to arrest Van Keuren after he concluded there was probable cause to believe Van Keuren violated the no contact order, the statute leaves the timing

and manner in which the arrest is accomplished to the arresting officer's discretion. Minnesota Statute § 629.72, subdivision 1a, however, brought to the Court's attention for the first time at oral argument, provides: "Notwithstanding any other law or rule, an arresting officer **may not issue a citation in lieu of arrest and detention** to an individual charged with harassment, domestic abuse, violation of an order for protection, or violation of a domestic abuse no contact order." ADT argues that § 629.72 imposed upon Zilge a ministerial duty to arrest Van Keuren and take him to a police station or county jail, where the officer in charge has discretion to issue a citation in lieu of continued detention. *Id.,* subd. 1b.

Because this issue was illuminated for the Court for the first time at oral argument, the Court believes that it would benefit from further briefing on this matter. In particular, the Court would find it helpful for the parties to discuss how §§ 518B.01 and 629.72 interact and whether Zilge's consultation with counsel affects the official immunity analysis under Minnesota law.

Accordingly, the Court denies ADT's motion for summary judgment regarding the comparative fault of the Washington County Sheriff's Office. The Court denies ADT's motion for summary judgment regarding the comparative fault of the St. Paul Park Police Department **without prejudice to re-file the motion within fourteen days of the date of this Order**. Counterclaimants shall have fourteen days after the filing of ADT's renewed motion to submit an opposition, and ADT shall file a reply within seven days of the filing of an opposition, if any.

## II.     MOTIONS TO EXCLUDE

### A.      Standard of Review

Under Federal Rule of Evidence 702, governing the admissibility of expert testimony, expert testimony must satisfy three prerequisites to be admitted:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy.  Second, the proposed witness must be qualified to assist the finder of fact.  Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . .

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citations and internal quotation marks omitted).  The district court has a "gate-keeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

> The inquiry as to the reliability and relevance of the testimony is a flexible one designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue."  *Marmo*, 457 F.3d at 758.

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id.*; *see also Kumho*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). "Only if the expert's opinion is **so fundamentally unsupported that it can offer no assistance to the jury** must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (emphasis added) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

## B.      ADT's Motions to Exclude

ADT moves to exclude the testimony of counterclaimants' experts Jeffrey Zwirn, Michael Bayless, and Joseph Olson.  It also moves to strike Anthony R. Caspers on the ground that he was untimely disclosed as an expert witness.  The Court will address each witness in turn.

### 1.      Jeffrey Zwirn

Counterclaimants have designated Jeffrey Zwirn as a security and alarm expert to testify about alleged deficiencies in the ADT security system.  In his report, Zwirn elaborates on the various ways in which ADT failed to program, install, and test the system; train Lee on the use of the system and warn her of its deficiencies; maintain the system; and comply with equipment manufacturers' specifications, industry standards, and its own internal policies and procedures.  (Aff. of Jeffrey D. Zwirn, Sept. 14, 2009, Ex. B, Docket No. 224.)

ADT does not object to the admissibility of Zwirn's opinions regarding ADT's alleged failures, which constitute the bulk of his report. Instead, it challenges his opinions on "causation." Zwirn opines that the security system's alleged deficiencies "were each a direct and substantial cause of the murder of Teri Lee and the severe emotional distress inflicted upon her four children." (*Id.* at 39.) Had ADT acted in accordance with its duties and representations to Lee, Zwirn opines, the occupants of the house would have been alerted to Van Keuren's entry and would have been able to react and take the necessary actions to protect themselves and/or escape. (*Id.* at 40.) ADT argues that Zwirn lacks sufficient qualifications to testify regarding "causation," including how Lee or Hawkinson would have responded had they received an audible alarm upon Van Keuren's cutting the telephone wires or entering the home.

Zwirn has over thirty-five years of expertise and experience in the alarm and security industry and has participated in the development, application, design, and monitoring of thousands of burglar and fire alarm systems. (Zwirn Aff. ¶ 1, Docket No. 224; *id.*, Ex. A.) However, as he has readily acknowledged, Zwirn is not an expert on firearms, human factors, human behavior, or reaction times. (Aff. of Charles C. Eblen, Mar. 19, 2010, Ex. H at 172-74, Docket No. 195.) "[F]or an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009).

In response to ADT's objection, counterclaimants highlight connections between Zwirn's experience and expertise and numerous opinions contained in his report. Specifically, counterclaimants point to Zwirn's opinions regarding (a) how ADT

encouraged Lee to rely on its expertise, creating a false sense of security and increasing Lee's vulnerability; (b) how ADT breached its duty to warn Lee about the deficiencies in the system; (c) how ADT's numerous departures from standards of care applicable to a reasonably prudent alarm company increased the risk of harm to Lee, by lulling her into a false sense of security; (d) how the components of ADT's security system were capable of being installed and programmed to provide the notice Lee requested and believed she had purchased; and (e) how and why the ADT security system failed to activate an audible siren and failed to provide notice and warning to Lee and Hawkinson.

However, ADT does not challenge any of these opinions referenced by counterclaimants, however; it only objects to Zwirn's opinions regarding (a) the manner in which Hawkinson would have responded if an alarm had sounded; (b) Hawkinson's likelihood of successfully defending against Van Keuren; (c) whether Lee and the other occupants could have evacuated the home to avoid the murders and other injuries sustained.

Counterclaimants offer no defense of how Zwirn's qualifications justify his opinions in these three areas.  Accordingly, the Court will exclude Zwirn's testimony regarding these areas, as it appears "so fundamentally unsupported that it can offer no assistance to the jury . . . ."  *Bonner*, 259 F.3d at 929-30.  However, to the extent that Zwirn's other opinions about the failures of ADT's security system can be characterized as opinions about "causation," they will not be excluded.

### 2.    Michael Bayless

Counterclaimants have proffered Michael Bayless, a clinical and forensic psychologist, as a rebuttal expert witness.  Bayless has previously provided expert testimony in both criminal and civil matters and has never failed to qualify as an expert at trial.  (Aff. of Lori L. Barton, Apr. 16 2010, Ex. T at 89-90, Docket No. 229.)  His testimony is intended to rebut that of William J. Lewinski, an expert proffered by ADT who opines that Hawkinson could not have prevented the murders.

Bayless has treated individuals involved in a variety of crimes, and runs a large psychology clinic.  (*Id.* at 94-95.)  He includes as part of his expertise how stress affects human reactions.  (*Id.* at 75.)  As Bayless explains, "[t]hat's what the clinical and forensic psychologists do is interpret behavior."  (*Id.* at 120.)  For his report, Bayless considered a wide range of material and documents relative to the case; he also personally interviewed Van Keuren, although he did so only after submitting his expert report.  (*Id.* at 12.)

The Court agrees with ADT that Bayless's report meanders and is unclear as to what evidence or expertise forms the basis of many of his opinions.  Nevertheless, at least some of Bayless's opinions are appropriately based on his expertise examining human behavior as a clinical and forensic psychologist and are properly characterized as rebuttal testimony.  For example, in response to Lewinski's theory of why Hawkinson was not in bed while he was shot, Bayless offers alternative hypotheses.  (Aff. of Michael B. Bayless, Jan. 22, 2010, Ex. B at 6, Docket No. 226.)  Distinguishing between a person's reaction upon being awakened from sleep by a blaring siren as opposed to a sound in the home, Bayless opines that Hawkinson would have experienced a heightened sense of

urgency if the alarm had sounded.  (*Id.*)  He also points to the fact that Van Keuren previously terminated his attack on Lee after noticing pictures of her children as support for his opinion that if the alarm had sounded, there would likely have been enough stimuli to cause him to consider aborting his mission.  (*Id.*)

ADT argues that Bayless's failure to identify any established methodology or scientific process used to arrive at his opinions warrants the exclusion of his testimony. However, "observations coupled with expertise generally may form the basis of an admissible expert opinion."  *Shuck v. CNH Am., LLC*, 498 F.3d 868, 875 (8th Cir. 2007); *see also Kumho*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). ADT also asserts that Bayless's opinions are irrelevant because he could opine only that it was possible, not probable, that Hawkinson would have killed Van Keuren.  As discussed below and further in the context of the parties' summary judgment motions, however, ADT's liability does not turn only on whether Hawkinson would have killed Van Keuren.

The Court concludes that Bayless is generally qualified to offer expert testimony on human behavior and responses to stress, under Rule 702, and that he should be permitted to rebut Lewinski's testimony in this regard.  While his report is wide-ranging and does not clarify how he is reaching each determination, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 595.

However, many of his opinions are clearly beyond the scope of his expertise and unfounded.  For example, Bayless opines that "if the alarm had gone off at the time the phone line was cut, Tim Hawkinson would have had ample time to get his gun, hide, escape down the back stairway with Teri Lee and the children, and/or possibly ready himself to face the intruder."  (Bayless Aff., Ex. B at 6, Docket No. 266.)  He also concludes that the alarm system was improperly installed.  (*Id.* at 5.)  These particular opinions are unsupported by Bayless's expertise in the area of human behavior and should be excluded.  The Court will not exclude his testimony in its entirety as ADT currently proposes, but rather rule on appropriate objections at trial if he strays outside of his areas of expertise and/or goes beyond a rebuttal of Lewinski's report.

### 3.    Joseph Olson

ADT also challenges Joseph Olson, a law professor at Hamline University School of Law whose testimony counterclaimants intend to use to rebut Lewinski's testimony that Hawkinson's plan to protect and defend Lee against an attack by Van Keuren was flawed and destined to fail.

Olson is a registered lobbyist and professor on Second Amendment issues and a prior director of the National Rifle Association of America.  (Eblen Aff., Ex. K at 8-9, Docket No. 195; Aff. of Joseph E. Olson, Jan. 28, 2010, Ex. A at 6, Docket No. 227.) Olson has been studying and training people in the use of firearms for personal protection for more than fifteen years.  (Eblen Aff., Ex. K at 70, Docket No. 195.)  He owns Firearms Training Professionals, LLC, which conducts courses to prepare citizens to undertake the responsibility of carrying a firearm for personal protection and to qualify

for state carry permits.  (Olson Aff., Ex. A at 6, Docket No. 227.)  He also trains instructors to teach firearms permit courses.  (*Id.*)  Olson has authored several articles and books related to firearm usage.  (*Id.* at 6-7.)

In his report, Olson opines that Hawkinson would have been able to protect himself and Lee if the alarm had sounded.  (*Id.*, Ex. B.)  He bases his opinion on Hawkinson's "highly advantageous tactical position as an ensconced defender at the top of a stairway."  (*Id.* at 1.)  According to Olson, his report is based on his experience in the field of training individuals in the use of firearms for personal protection.  (Eblen Aff., Ex. K at 70, Docket No. 195.)

ADT argues that Olson did not conduct any particular research specific to this case.  However, observations and highly specialized expertise may suffice to form the basis of an expert opinion.  *Kumho*, 526 U.S. at 156; *see also Fed. Crop Ins. Corp. v. Hester*, 765 F.2d 723, 728 (8th Cir. 1985) ("A witness's practical experience can be the basis of qualification as an expert.").  Moreover, Olson incorporates the timing measurements made by ADT's expert Lewinski.  (Aff. of J. Stan Sexton, Sept. 30, 2010, Ex. Y at 131, Docket No. 297.)

ADT also points to numerous other weaknesses in Olson's report.  For example, his experiences directly observing individuals in a training environment may be of less relevance in the context of the stressful, life-threatening encounter in Lee's home.  Olson did not inspect the fanny pack of the type in which Hawkinson stored his gun, nor did he perform timing experiments similar to those undertaken by ADT's expert.  (Eblen Aff., Ex. K at 136, Docket No. 195.)  In addition, Olson formed his opinion before visiting the

scene, although he previously reviewed a model of the Lee home and spoke with counterclaimants' counsel about the factual circumstances of the case. (*Id.* at 13, 91.)

However, "[g]enerally the factual basis of an expert's opinion goes to the credibility of the expert's testimony, not the admissibility of the testimony. Any weaknesses or inconsistencies in [his] testimony on this matter will be subject to vigorous cross examination." *Finke v. Hunter's View, Ltd.*, 596 F. Supp. 2d 1254, 1268 (D. Minn. 2009). Therefore, the Court denies ADT's motion to exclude Olson.

### 4. Whether Bayless and Olson are Proper "Rebuttal" Expert Witnesses

In addition to challenges to whether they pass muster under *Daubert* and Rule 702, ADT argues that neither Bayless nor Olson are proper "rebuttal" witnesses. Rather, according to ADT, they are "causation" witnesses improperly disclosed after counterclaimants realized they did not carry their burden on causation.

At the heart of this dispute is the question of whether expert testimony is necessary to establish causation in this case. As the Court has made clear, it is not. ADT argues that counterclaimants must establish that had the alarm sounded at the time and in the manner they contend should have occurred, Hawkinson would have awoken, removed his sleeping mask, drawn his weapon, and "succeeded in a shootout with a determined criminal in a dark, crowded bedroom." (ADT's Reply at 5, Docket No. 236.) Since counterclaimants require expert testimony to establish what would have occurred in Lee's bedroom the night of the murders, and since Bayless and Olson cannot definitively

conclude what would have happened and are merely offered as rebuttal experts, ADT argues, counterclaimants cannot establish causation.

In fact, a shootout between Van Keuren and Hawkinson is not the only plausible scenario by which a jury could infer that the murders could have been avoided in the absence of ADT's alleged negligence. As discussed above, to establish causation on their tort claims counterclaimants need only show that ADT's actions were "a substantial factor in the harm's occurrence." *George v. Estate of Baker*, 724 N.W.2d 1, 10 (Minn. 2006). "The classic test for determining factual cause is to compare what actually happened with a hypothetical situation identical to what actually happened but without the negligent act." *Id.* at 11.

Counterclaimants have met this standard. Counterclaimants have proffered evidence that Hawkinson and Lee were well aware of the likelihood of an attempted attack by Van Keuren, that Hawkinson was armed and prepared to shoot Van Keuren, that Van Keuren did not know about Hawkinson or about the existence of an alarm system in the house, and that the ADT security system was purchased specifically for the purpose of alerting the residents of the Lee home to a break in by Van Keuren and giving them time to respond. Van Keuren had indicated his willingness to abort a lethal mission previously, and a jury could infer that with appropriate stimuli, including a loud blaring alarm, he may have reconsidered his mission. Van Keuren testified that nothing would have prevented him from carrying out the murders, but he also testified that he wavered in his decision to kill Lee or just himself; in any event, a jury need not find his testimony credible. A jury instead might reasonably infer that an audible alarm would have given

the occupants an opportunity to hide or call for help or otherwise altered the outcome from what actually transpired.

Under Minnesota law, expert testimony is necessary only where "the ordinary layman cannot reasonably possess well-founded knowledge of the matter[,]" as with "question[s] involv[ing] obscure and abstruse medical factors . . . ." *Willert v. Ortho Pharm. Corp.*, 995 F. Supp. 979, 983 (D. Minn. 1998) (citing *Stahlberg v. Moe*, 166 N.W.2d 340, 345 (Minn. 1969)). A jury does not need expert testimony to infer that had ADT's security system issued an audible alarm when Van Keuren forcibly entered the residence, the murders might not have occurred; common sense will suffice. *See, e.g.*, *Tousignant v. St. Louis Co., Minn.*, 615 N.W.2d 53, 59-60 (Minn. 2000) (expert testimony unnecessary where plaintiff claimed she fell and broke her hip because nursing home failed to restrain her). While expert testimony may bolster ADT's defense that even an audible alarm would not have prevented the murders, testimony regarding reaction times, lethal force encounters, behavioral science, firearms, and the body's physiological response under stress is not necessary for counterclaimants to establish causation. Accordingly, counterclaimants' reliance on Bayless and Olson as rebuttal expert witnesses, rather than witnesses supporting their case-in-chief, is not fatal to their tort claims. Likewise, the failure of counterclaimants' experts to state with certainty exactly what occurred the night of the murders or what would have occurred does not deprive them of the ability to opine about discrete topics on which they are experts and which comport with Rule 702. Indeed, ADT's own expert Lewinski has acknowledged that the precise actions in the Lee bedroom on September 22, 2006, can never be known.

"The function of rebuttal [testimony] is to explain, repel, counteract or disprove evidence of the adverse party . . . ." *United States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir. 2005) (internal quotation marks omitted). "As such, rebuttal evidence may be used to challenge the evidence or theory of an opponent – and not to establish a case-in-chief." *Marmo*, 457 F.3d at 759. In this case, the testimony of Bayless and Olson properly responds to ADT's theory, as articulated by Lewinski, that Hawkinson was unprepared for Van Keuren's attack. To the extent that the Bayless and Olson attempt to testify beyond theories put forth by Lewinski, the Court will rule on appropriate objections during trial.

### 5.    Anthony R. Caspers

ADT moves to strike Anthony R. Caspers as an expert witness because counterclaimants did not disclose him in a timely fashion. *See* Fed. R. Civ. P. 37(c)(1), 26(a)(2). However, counterclaimants do not plan to rely upon Caspers as an expert witness. Rather, they characterize him as a rebuttal fact witness under Rule 701 whose testimony will rebut ADT's claim that, for lack of training, Hawkinson would not have been able to successfully defend against Van Keuren's attack. Fact witnesses are not subject to the disclosure requirements applicable to expert witnesses. *See C.H. Robinson Worldwide, Inc. v. Ghirardelli Chocolate Co.*, No. 03-2978, 2005 WL 1432199, at *2 (D. Minn. May 23, 2005).

Counterclaimants submitted Caspers's affidavit in response to expert reports by ADT experts Lewinski and Henry L. Homrighaus, Jr. that Hawkinson lacked the tactical training, awareness, and skills necessary to save his life and that of Lee. (Aff. of Lori L.

Barton, June 21, 2010, Ex. B at 4-5, Ex. C at 11-13, Docket No. 281.)  In particular, Lewinski elaborates on what Hawkinson did and did not learn in the training program for his concealed carry license.  (*Id.*, Ex. B at 4-5.)

Caspers is a Minneapolis police officer and president of Final Option, Inc., a company offering advanced firearm instruction.  (Aff. of Anthony R. Caspers, May 6, 2010, ¶¶ 1-2, Docket No. 250.)  He has taught the monthly Minnesota Concealed Carry Safety Course at the Metro Gun Club in Blaine, Minnesota, since late 2002 or early 2003. (*Id.* ¶ 3.)  Hawkinson's son testified that his father completed this particular course in late 2003 or early 2004, although Caspers had no record of his attendance because he disposes of course records after five years.  (*Id.* ¶ 7; *id.*, Ex. D at 41-42.)  In his affidavit, Caspers describes with particularity the substance of what he teaches in the Concealed Carry Safety Course.

The Court concludes that Caspers is an appropriate fact witness and that he has the requisite personal knowledge to testify about what is taught in the Concealed Carry Safety Course that Hawkinson attended, pursuant to Rule 701; although he was disclosed after the fact discovery deadline, counterclaimants' tardiness is excusable given their usage of Caspers's testimony to respond to the reports of Homrighaus and Lewinski. Because ADT's motion is styled as one to strike Caspers as an expert, the Court grants it. However, the Court will permit counterclaimants to call Caspers to offer rebuttal fact testimony.

### C.      Counterclaimants' Motions to Exclude

Counterclaimants have moved to exclude the entire testimony of ADT's experts Lewinski, Arden, Homrighaus, Schomer, and Jensen, and a portion of the testimony of James Mooney, designated as a lay witness employee-expert under Rule 701.  They have also moved to strike David Zakrewski as an expert witness, although counterclaimants assert that Zakrewski is not proffered as an expert.

### 1.      William Lewinski

Counterclaimants challenge William J. Lewinski, a professor emeritus at Minnesota State University, Mankato, who ADT offers as an expert in human reactions and performance in deadly force encounters.   His opinion focuses on criticizing Hawkinson's ability to defend successfully against Van Keuren's attack, including his decision to keep a loaded handgun in a fanny pack by his bed, his alleged mistake of not getting his gun before getting out of bed, and the time it took Van Keuren to reach the bedroom after cutting the telephone lines.  (Aff. of Lori L. Barton, Aug. 30, 2010, Ex. 32, Docket No. 293.)

Counterclaimants' attack on Lewinski's qualifications to render his opinions focuses on his alleged misrepresentation that he received a doctoral degree in Police Psychology from Union Institute and University in Cincinnati, Ohio, in 1988.  (*Id.*, Ex. 37.)  According to counterclaimants, Union has never offered such a degree.  (*Id.*, Exs. 38, 39.)   ADT obtained an affidavit from the university's registrar, however, confirming that Lewinski's representation about his degree is accurate.  (Sexton Aff., Ex. X, Docket No. 299.)

Lewinski conducts research on human performance during deadly force encounters, and his work has included interviewing over 1,200 law enforcement officers who have been involved in deadly force incidents. (*Id.*, Ex. V ¶ 4.) Before his retirement, Lewinski directed Mankato State University's Law Enforcement Program and chaired the Political Science/Law Enforcement Department. (*Id.* ¶ 1.) The Court concludes that he is generally qualified to opine about human behavior in deadly force encounters. Counterclaimants' challenges to Lewinski's academic and professional background, including his lack of licensure as a psychologist, failure to publish work in peer-reviewed journals of psychology or behavioral science, and dearth of experience as a police officer or forensic medical examiner, are suitable fodder for cross-examination; however, they do not serve to disqualify Lewinski entirely.

Counterclaimants further argue that courts have excluded or limited Lewinski's testimony, but those decisions are based on the distinct factual circumstances and expert reports submitted in those cases. *See, e.g.*, *White v. Gerardot*, No. 1:05-CV-382, 2008 WL 4724004, at *2 (N.D. Ind. Oct. 24, 2008) (applying to Lewinski's testimony "similar limitations" imposed on opposing party's expert, precluding legal conclusions and other testimony improperly invading province of jury); *Meadours v. Ermel*, No. H-04-0102, 2008 WL 7071461, at *1 (S.D. Tex. Dec. 2, 2008) (ordering defendants to have Lewinski submit a "real report").

Counterclaimants assert that Lewinski's opinions ignore the facts of this case. Lewinski reviewed, among numerous other materials, Van Keuren's deposition testimony. (Barton Aff., Ex. 32 at 1-2, Docket No. 293.) According to counterclaimants,

in assuming that Hawkinson was awakened by an alarm or other noise no later than the point at which Van Keuren broke the sliding door, Lewinski relies exclusively on certain portions of Van Keuren's deposition rather than the testimony of the children, law enforcement officers, as well as the results of the alarm testing showing that no audible alarm was triggered until the two girls fled the house.  Lewinski also neglects to consider Van Keuren's lack of marksmanship and training, and whether Van Keuren was impeded by the slope of the property and poor weather conditions while traveling to the back door from the telephone lines.  Counterclaimants assert that Lewinski's role is essentially to bolster Van Keuren's credibility and remove from the jury the common sense determination of whether Hawkinson could have defended against Van Keuren.

However, Lewinski states in his report that his calculations regarding time are based on Van Keuren's testimony **as well as** his research on human behavior and his own physical measurements of the scene, and that the precise timing of events and actions of Hawkinson can never be known.  (*Id.* at 9.)   Numerous facts in this case are contested. While a jury may believe that Hawkinson was shot in bed and was unaware of Van Keuren's presence until shortly before he entered the master bedroom, the Court will permit ADT to offer expert testimony in support of its own contrary theory.

The Court is, however, concerned that Lewinski's re-enactment of the events in the Lee bedroom may not be properly supported and may tend to prejudice and confuse the jury.  Lewinski breaks Van Keuren's movements into stages and provides the distance and estimated time range for completion of each stage.  (*Id.* at 7-9.)  In positing a re-enactment, Lewinski assumes, among other things, that Hawkinson was alerted to Van

Keuren's presence when he broke the glass door, and that Hawkinson was not in bed when shot. While the Court will not exclude Lewinski's testimony in its entirety, the Court will require an evidentiary hearing outside the jury's presence regarding his re-enactment if ADT seeks to submit testimony regarding the re-enactment to the jury. In addition, the Court agrees with counterclaimants' assertion that Lewinski's discussion of Hawkinson's training in his Concealed Carry course is without foundation. The Court will prohibit Lewinski from discussing the Concealed Carry course. In all other regards, the Court denies counterclaimants' motion to exclude or limit Lewinski.

### 2.    Jonathan Arden

Counterclaimants move to strike Jonathan Arden, a forensic pathologist who opines that the features, locations, and trajectories of the gunshot wounds on Hawkinson and Lee demonstrate that they were not shot while in bed, and that Hawkinson likely struggled with Van Keuren. (Barton Aff., Ex. 28 at 4, Docket No. 293.)

Counterclaimants argue that Arden's opinion is undermined by Principal Assistant Ramsey County Medical Examiner, Dr. Kelly M. Mills, who testified that she found no evidence as to where Hawkinson was when he sustained three gunshot wounds. (*Id.*, Ex. 52 at 17-18.) Mills critiqued Arden's report for relying upon unfounded assumptions. (*Id.* at 55-56.) However, "[e]xperts frequently disagree and their opinions, if reliable, are for a jury's consideration." *Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 921 n.11 (8th Cir. 2002).

Arden bases his opinions on his review of the factual materials and his significant experience as a pathologist, and Mills agrees with several of his conclusions. The Court

therefore denies the motion to strike Arden and will respond to objections regarding specific testimony at trial.

### 3.      Henry L. Homrighaus, Jr.

ADT has proffered Henry L. Homrighaus, Jr., a licensed security consultant employed by ADT from 1965 to 1982, as an expert witness.  He opines on standards of care in the security systems industry, and the adequacy of ADT's design and programming of Lee's security system.  (Barton Aff., Ex. 31 at 5-10, Docket No. 293.) He also criticizes the testing on the security system performed by counterclaimants' expert Zwirn, and concludes that contrary to Zwirn's testing, it is more likely than not that the glass break detector did set off the alarm when Van Keuren broke into the home. (*Id.* at 12.)  In addition, Homrighaus describes Hawkinson's plan to defend himself and the other residents of Lee's home as deeply flawed in design and execution.  (*Id.*)

Counterclaimants argue that Homrighaus's opinions are speculative, insufficient, unsupported by methodology, and ignore record evidence unfavorable to his positions. For example, they cite Homrighaus's failure to attend any of the inspection testing performed at the Lee residence on January 31, 2007 and June 1, 2007.  However, Homrighaus did review video recordings of those inspections.  He has worked in the electronic security field for over forty-four years, designing, building, and installing security systems and owning and operating several security related companies.  (*Id.* at 14.)  The Court concludes that Homrighaus is qualified by experience to render his opinions. Fed. R. Evid. 702.  Counterclaimants also challenge Homrighaus's ability to criticize Hawkinson's plan of defense, including his choice of weapon, but Homrighaus

states in his report that he regularly consults with and advises clients on home protection strategies including firearm choice.

To the extent that counterclaimants seek to challenge Homrighaus's methods, inconsistencies with other experts, or lack of factual basis, they will be permitted to do so on cross-examination. The Court, however, denies the motion to strike Homrighaus.

### 4.      Paul Schomer

Paul Schomer is ADT's acoustic engineering expert who analyzes an audio track of the video recording of Zwirn's testing and concludes that Zwirn's work is unreliable. Specifically, Schomer concludes that Zwirn's allegedly flawed testing methods precluded the glass break detector from sounding an alarm during his testing, but that if the ADT security system was properly functioning it is more likely than not that the glass break detector signaled an alarm. (Barton Aff., Ex. 33 at 7, Docket No. 293.)

Counterclaimants attack Schomer's testimony, arguing that he lacks expertise about alarm systems, employs invalid reasoning, does not apply the facts of the case properly, and offers only speculative conclusions. Schomer did not conduct any independent testing of the audio glass break detector in the basement of the Lee home, he reviewed the recording of Zwirn's testing. While Schomer clearly disagrees with Zwirn's approach, a jury should be permitted to determine whether his criticism is warranted and whether he has a valid factual basis for his opinions.

Counterclaimants argue that Schomer is not an expert in alarm systems, but his expertise in acoustic engineering and experience in the acoustics of alarm and other systems qualifies him to analyze the testing of the glass break detector, which relies upon

acoustic signal processing.  An audio track separately recorded the breaking of two panes of glass on the sliding glass door in the basement during Zwirn's testing, providing a testing record of sound radiation and the travel of sound from the door to an audio receiver.  (Sexton Aff., Ex. AA ¶ 14, Docket No. 299.)  Schomer's analysis of the glass break detector follows a methodology appropriate for his field and passes muster under *Daubert* and Rule 702.  He essentially took the information made available to him by Zwirn's testing and analyzed it to determine whether the breaking of glass panels would trigger the glass break detector installed in the basement.   The Court denies counterclaimants' motion to strike Schomer.

### 5.   Jonathan Jensen

ADT proffers Jonathan Jensen, a clinical psychologist, as an expert witness to opine about the impact of Lee's death on her children, all four of whom are counterclaimants and at least one of whom witnessed the murders.  Counterclaimants specifically object to Jensen's opinion that various gifts from community members – including a new home from a television program and weekly pizza delivery –  remind them of the tragedy of their mother's deaths.  (Barton Aff. Ex. 29 at 7, 11, Docket No. 293 (filed under seal).)

Counterclaimants argue that ADT is attempting to reduce the amount of any damages awarded by a jury against ADT by convincing a jury that the Swenson-Lee family has already been adequately compensated for their loss through community donations.  Evidence of community donations, counterclaimants argue, should be deemed prejudicial and inadmissible under Rule 403.  The evidence is also irrelevant, according

to counterclaimants, because under Minnesota's common law collateral source rule a plaintiff's recovery is not diminished by compensation from a third party. *See Duluth Steam Co-op Ass'n v. Ringsred*, 519 N.W.2d 215, 217 (Minn. Ct. App. 1994).

Counterclaimants' challenge to the admissibility of evidence regarding donations may well be valid, but it is not an appropriate ground for striking Jensen's testimony in its entirety. Rather, counterclaimants should move to exclude such evidence through a motion in limine. *See, e.g.*, *Viking Yacht Co. v. Composites One LLC*, 613 F. Supp. 2d 637, 645 n.11 (D.N.J. 2009) (deferring ruling on a hearsay challenge to evidence relied upon by expert in the context of a motion to exclude expert testimony). The Court denies counterclaimants' motion to exclude Jensen.

### 6.     James Mooney

Counterclaimants seek to exclude only one opinion set forth by ADT's employee-expert James R. Mooney in his deposition –  namely, his view that the inspection and testing protocol utilized by Zwirn was flawed and resulted in a failure to obtain all of the potential information from the security system. (*See, e.g.*, Barton Aff., Ex. 34 at 61, 88, Docket No. 293.) Mooney asserts that people moving around the house, opening and closing doors, during the inspection affected the way in which the system keypad displayed the alarm history and prevented it from indicating that the alarm had sounded in the basement when Van Keuren entered it.

Counterclaimants characterize ADT as alleging spoliation of evidence, in part through Mooney's testimony. ADT waived its right to make such an allegation, counterclaimants argue, when they agreed in advance to the protocol Zwirn applied

during his inspection.  Agreeing to the protocol, however, did not deprive ADT of the opportunity to challenge Zwirn's methodology in the future.  ADT essentially seeks to prove that but for the manner in which Zwirn conducted his examination, the alarm history would have reflected that an audible alarm sounded when Van Keuren broke the basement glass door.  While there is significant evidence to the contrary, including Zwirn's conclusions and the children's deposition testimony, the Court will permit ADT to present evidence in support of its theory.  Should it appear in the course of trial that ADT is alleging spoliation or suggesting the jury draw an adverse inference from the current unavailability of the alarm history, however, the Court will respond to an objection if and when it arises.

Counterclaimants also assert that Mooney is not qualified to testify about the alarm history as an employee-expert.  "[I]f a witness is not testifying as an expert, then any testimony by the witness expressing his or her opinion or inferences is limited to those that are rationally based on the witness's perception and helpful to understanding the witness's testimony or determining a fact in issue."  *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009).  "[P]erceptions based on industry experience, is a sufficient foundation for lay opinion testimony."  *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004-05 (8th Cir. 1986).

Mooney, ADT's National Director of Field Support, was deposed by counterclaimants as ADT's corporate representative to explain how to read and interpret alarm memory sent from alarm panels to ADT's central monitoring center.  In his position, he evaluates and coordinates dialing activities within ADT's customer

monitoring centers, and spends approximately fifteen percent of his time communicating with ADT managers about customer service issues. (Barton Aff., Ex. 34 at 89-90, Docket No. 293.) While he was not present during Zwirn's inspection, Mooney reviewed the videotape of the site inspection as well as numerous other relevant materials, and also visited the residence himself. (Sexton Aff., Ex. Q at 12-13, Docket No. 299.)

The numerous potential weaknesses in Mooney's testimony – including the fact that he has seen no data indicating that the basement glass break detector **did** go into alarm – are appropriate topics of cross-examination. The Court concludes that he is qualified as an employee-expert to discuss communications between the security system and ADT's central monitoring center, but counterclaimants may raise appropriate objections to opinions that exceed his knowledge base at trial.

### 7.   David Zakrewski

David Zakrewski is a Honeywell engineer who counterclaimants charge is an untimely disclosed rebuttal expert witness. ADT, however, characterizes him as a fact witness whose affidavit was submitted to rebut counterclaimants' motion to strike ADT expert Mooney.

As discussed above in the context of the Court's consideration of Caspers, a lay witness may testify to his personal observations or knowledge gained from industry experience. "[T]he mere fact that the witness, by virtue of his education, training or experience, is capable of being qualified as an expert, does not serve as a valid objection to his expression of lay opinion testimony." *Hartzell Mfg., Inc. v. Am. Chem. Techs., Inc.*, 899 F. Supp. 405, 408 (D. Minn. 1995). Rather, "[w]hen a lay witness has

particularized knowledge by virtue of [his] experience, [he] may testify – even if the subject matter is specialized or technical – because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009).

The Court concludes that just as Caspers may offer lay testimony regarding the content of the Conceal Carry course he teaches, Zakrewski may offer factual information about the design and operation of the alarm panel which he developed, designed, and for which he oversaw all engineering.  (Sexton Aff., Ex. R, Docket No. 299.)  The Court will grant the motion to strike Zakrewski as an expert witness.  However, the Court will permit Zakrewski to offer lay witness testimony about the alarm panel gleaned from "his industry experience, and from his review of the records that have been prepared . . . in the ordinary course of . . . business pursuits."  *Duluth Lighthouse for the Blind v. C.G. Bretting Mfg. Co.*, 199 F .R.D. 320, 324 (D. Minn. 2000) (omissions original).  "Of course, as [a] fact witness[], [Zakrewski] cannot offer [his] **opinion** to rebut [counterclaimants'] experts' opinions . . . ."  *C.H. Robinson Worldwide, Inc.*, 2005 WL 1432199, at *2 (emphasis original).  The Court will consider appropriate objections that Zakrewski's testimony exceeds that of a lay witness at trial.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. ADT's Motion for Summary Judgment on the Comparative Fault of the Washington County Sheriff's Office and the St. Paul Park Police Department [Docket

No. 198] is **DENIED** as to the Washington County Sheriff's Office.  The motion is **DENIED without prejudice to re-file the motion within fourteen days of the date of this Order** as to the St. Paul Park Police Department.  Counterclaimants shall have fourteen (14) days after the filing of ADT's renewed motion to submit an opposition, and ADT shall file a reply within seven (7) days of the filing of an opposition, if any.

2.      ADT's Consolidated Motion for Summary Judgment [Docket No. 206] is **GRANTED** as to the Estate's Counts 2, 3, 6, 15, and 19 [Docket No. 181] and the Trustee and children's Counts 9 and 13 [Docket No. 182].  The motion is **DENIED** in all other respects.

3.      Counterclaimants' motion for partial summary judgment [Docket No. 211] is **DENIED**.

4.      ADT's Motion to Exclude the Testimony of Defendants/Counterclaimants' Experts Jeffrey Zwirn, Joseph Olson, and Michael Bayless [Docket No. 192] is **DENIED**, but the Court shall not permit Zwirn to testify regarding Hawkinson's ability to defend himself.

5.      ADT's Motion to Strike Defendants/Counterclaimants' Expert Anthony R. Caspers [Docket No. 277] is **GRANTED**, but Caspers is permitted to offer lay testimony.

6.      Defendants/Counterclaimants' Motion to Exclude the Testimony of Plaintiff/Counterclaim Defendants' Expert Witnesses [Docket No. 291] is **DENIED**, but Lewinski may not testify regarding the Concealed Carry course and the Court will require an evidentiary hearing outside the jury's presence if ADT seeks to offer testimony regarding Lewinski's re-enactment.

- 84 -

7.    Defendants/Counterclaimants' Motion to Strike ADT Expert David Zakrewski [Docket No. 306] is **GRANTED**, but Zakrewski is permitted to offer lay testimony.


DATED:  March 21, 2011                    _____
at Minneapolis, Minnesota.                      s/ John R. Tunheim
                                                JOHN R. TUNHEIM
                                          United States District Judge