UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| ADT SECURITY SERVICES, INC., | Civil No. 07-2983 (JRT/AJB) |
| Plaintiff/Counter Defendant, | |
| v. | |
| VICKI SELIGER SWENSON, *as Personal Representative of the Estate of Teri Lynn Lee and as Trustee for the Next-of-Kin of Teri Lynn Lee, Decedent*; T.M.L., T.B.L., T.J.L., and T.M.L., *minors, through their Co-Guardians and Co-Conservators, Erik P. Swenson and Vicki Seliger Swenson*, | ORDER |
| Defendants/Counter Claimants. | |

Amanda M. Cialkowski, Brian N. Johnson, and Cortney G. Sylvester, **NILAN JOHNSON LEWIS PA**, 120 South Sixth Street, Suite 400, Minneapolis, MN 55402; Charles C. Eblen and J. Stan Sexton, **SHOOK, HARDY & BACON, LLP**, 2555 Grand Boulevard, Kansas City, MO 65108-2613, for plaintiff/counter defendant.

Paul D. Peterson, Lori L. Barton, and William D. Harper, **HARPER & PETERSON, PLLC**, 3040 Woodbury Drive, Woodbury, MN 55129-9617, for defendants/counterclaimants.

This case arises out of the tragic murders of Teri Lynn Lee and Timothy J. Hawkinson, Sr. by Steven Van Keuren on September 22, 2006. Van Keuren broke into Lee's home, in which plaintiff ADT Security Services, Inc. ("ADT") had recently installed a security system; the alarm allegedly did not sound until after the murders were

committed. ADT filed suit against the estates of Lee and Hawkinson,[1] seeking a declaratory judgment that its liability is limited by the Residential Services Contract ("the Agreement") signed by Lee. Lee's sister, Vicki Seliger Swenson, as the personal representative of the estate and trustee for the next of kin of Lee, subsequently alleged numerous counterclaims against ADT, as did Lee's four children, who were in the house when the murders occurred.

By order of March 21, 2011, the Court addressed several motions, including three motions for summary judgment. *See ADT Sec. Servs., Inc. v. Swenson*, No. 07-2983, 2011 WL 1084031 (D. Minn. March 21, 2011) ("the March Order"). One of the motions concerned ADT's argument that the Washington County Sheriff's Office and the St. Paul Park Police Department ("the Police Department") are at fault for Lee's death for their failure to arrest Van Keuren in the days and hours preceding Lee's death. ADT moved the Court to compel a jury to assess a proportionate percentage of fault to these two entities. *See* Minn. Stat. § 604.02 ("When two or more persons are severally liable, contributions to awards shall be in proportion to the percentage of fault attributable to each, except that . . . a person whose fault is greater than 50 percent . . . [is] jointly and severally liable for the whole award . . . ." (quotation reordered)).

The Court denied the motion for summary judgment regarding comparative fault on the part of the Washington County Sheriff's Office. It denied the motion as to the Police Department without prejudice. ADT's renewed motion for summary judgment on the comparative fault of the Police Department is now before the Court. The Court

---

[1] ADT has settled its claims against Hawkinson's estate.

concludes that the response of the Police Department's officer to the circumstances required the exercise of discretion; accordingly, the Court denies the motion.[2]

### BACKGROUND[3]

After being charged with assaulting his ex-girlfriend Lee in her home on July 29, 2006, Van Keuren posted bail and was released from Washington County Jail on August 1, 2006. (Aff. of Charles C. Eblen, March 24, 2010, Ex. A at 6, Docket No. 201.) Washington County Judge Gregory G. Galler, in a Conditional Release No Contact Order ("the no contact order") ordered Van Keuren to have no contact with Lee or her children and to stay outside the one mile vicinity of her residence. He warned that if Van Keuren violated the order, "you are going to be picked up or going to be thrown in jail . . . ." (*Id.*)

On September 20, 2006, Van Keuren appeared at the junior high school in St. Paul Park where Lee's eldest daughter was playing volleyball. (*Id.*, Ex. I.) Van Keuren left before the police arrived. (*Id.* at H&P02195.) Officer Jesse Zilge, a licensed Minnesota peace officer then employed by the St. Paul Park Police Department, was dispatched to the school. (Aff. of Officer Jesse Zilge, April 15, 2011, ¶¶ 1, 2, Docket No. 333.) Van Keuren had left the scene by the time Zilge arrived. (*Id.* ¶ 3.) Zilge spoke with Lee's daughter, who reported that she saw Van Keuren in the crowd. (*Id.* ¶ 4.) He also spoke

---

[2] Also pending before the Court are requests and issues raised by the parties in letters to the Court.

[3] The Court summarizes only those facts relevant to the instant motion. A more thorough factual background is available in the Court's March Order. *See ADT Sec. Servs., Inc.*, 2011 WL 1084031, at *2-8.

with Lee, who arrived at the school a short while later and described to Zilge the prior assault. (*Id.* ¶ 5.) Zilge confirmed the existence of the no contact order upon returning to the police station. (*Id.* ¶ 9.) At that point, Zilge had probable cause to believe that Van Keuren violated the terms of the no contact order, but Van Keuren's whereabouts were unknown. Zilge placed a phone call to Van Keuren's River Falls, Wisconsin residence and left a voicemail message asking him to return the call. (*Id.* ¶ 10.)

According to Zilge, the St. Paul Park Police Department's policy was to issue a misdemeanor citation for the violation of a no contact order where (a) there was probable cause to believe a violation had occurred but (b) the suspect was no longer at the scene when the police arrived and (c) the suspect's present whereabouts were unknown. (*Id.* ¶ 11.) Zilge had encountered such situations prior to September 20, 2006, and had issued misdemeanor citations on those occasions. (*Id.*) Zilge asserts that he did not have authority to contact the River Falls Police Department directly to request their assistance in locating and arresting Van Keuren, and it was his understanding that Wisconsin officers would not pick up a suspect for a violation of a Minnesota no contact order, at the time considered a misdemeanor offense; in Zilge's experience, Minnesota officials would not pick up and extradite to Wisconsin on a misdemeanor. (*Id.* ¶ 12.)

Zilge contacted the on-call Assistant Washington County Attorney, Mike Hutchinson, to discuss other avenues to secure Van Keuren's apprehension. (*Id.* ¶ 13.) Hutchinson determined that because Van Keuren resided in Wisconsin, the Police Department would need to follow the procedures set forth in the Uniform Criminal Extradition Act, Minn. Stat. §§ 629.01-629.29, to secure Van Keuren's arrest and return

- 4 -

to Minnesota.  (Aff. of Michael Hutchinson ¶ 4, April 15, 2011, Docket No. 334.)  In Hutchinson's experience, he has never seen a fugitive extradited from another state to Minnesota for a non-felony offense.  (*Id.*)  Accordingly, Hutchinson advised Zilge to generate a report and send it to the Washington County Community Corrections Conditional Release Officer, who had the authority to issue an apprehension and detention order and request that a Washington County judge issue a bench warrant for Van Keuren's arrest.  (*Id.* ¶ 5.)  He also advised Zilge to issue a misdemeanor citation to Van Keuren by mail, with the expectation that Van Keuren would comply with the citation and voluntarily appear at the time and place designated in the citation.  (*Id.* ¶ 6.)

In accordance with Hutchinson's advice, Zilge dictated his report and prepared the citation later that day.  (Zilge Aff. ¶ 14, Docket No. 333.)  Zilge did not mail the citation to Van Keuren or forward the report on September 20, however.  He wanted to review the report for accuracy after it was transcribed, on September 21, 2006, and he was hoping to view the junior high school's surveillance video and obtain a positive identification of Van Keuren before mailing the citation.  (*Id.*)  Zilge was off work from September 21 through September 24, 2006.  Prior to arriving for his next regularly-scheduled shift on September 25, Zilge learned that Van Keuren had murdered Lee and Hawkinson.  (*Id.* ¶ 15.)

In its renewed motion for summary judgment, ADT argues that it is entitled to have the jury consider the comparative fault of the Police Department for the death of Lee and for the Police Department to be held jointly and severally liable.

## ANALYSIS

I.   ADT'S RENEWED SUMMARY JUDGMENT MOTION

   A.   **Standard of Review**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

   B.   **St. Paul Park Police Department's Liability**

The question of whether the Police Department can be held jointly and severally liable for the harm alleged by counterclaimants turns on whether Zilge, and in turn the Police Department, can be held liable at all.  According to ADT, Zilge's failure to arrest Van Keuren constituted negligence *per se*, based on his failure to fulfill the allegedly mandatory, ministerial duty imposed by two statutes, Minn. Stat. §§ 518B.01, subd. 22(c)

(2006) and 629.72, subd. 1a(a) (2006) ("the domestic abuse statutes").[4]  Section 518B.01, subd. 22(c) provides:

> A peace officer shall arrest without a warrant and take into custody a person whom the peace officer has probable cause to believe has violated a domestic abuse no contact order, even if the violation of the order did not take place in the presence of the peace officer, if the existence of the order can be verified by the officer.  The person shall be held in custody for at least 36 hours, excluding the day of arrest, Sundays, and holidays, unless the person is released earlier by a judge or judicial officer.  A peace officer acting in good faith and exercising due care in making an arrest pursuant to this paragraph is immune from civil liability that might result from the officer's actions.

Section 629.72, subd. 1a(a) provides: "Notwithstanding any other law or rule, an arresting officer may not issue a citation in lieu of arrest and detention to an individual charged with harassment, domestic abuse, violation of an order for protection, or violation of a domestic abuse no contact order."  As ADT argues, the two sections seem to operate in tandem; for example, section 629.72 specifically incorporates section 518B.01's definition of a "violation of a domestic abuse no contact order."  *See* Minn. Stat. § 629.72, subd. 1(d).

A police officer, however, is protected by official immunity in the performance of his duties unless "[a] he fails to perform a ministerial act, or [b] when his performance of a discretionary act is willful or malicious."  *Thompson v. City of Minneapolis*, 707 N.W.2d 669, 673 (Minn. 2006).  ADT's summary judgment motion may be granted only if one of these two requirements is met.  ADT has not argued that Zilge acted willfully and maliciously in the performance of a discretionary duty.  Rather, according to ADT,

---

[4] All references throughout this Order to the domestic abuse statutes refer to the versions in effect in 2006.

the domestic abuse statutes created a mandatory, ministerial duty – the physical arrest of Van Keuren – which Zilge failed to perform. A discretionary act is one necessitating "the exercise of individual judgment in carrying out the official's duties." *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998). "A ministerial act, in contrast, is absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." *Thompson*, 707 N.W.2d at 673 (quotation marks omitted).

ADT argues that not only does the plain language of the domestic abuse statutes – "**shall** arrest without a warrant **and take into custody**"; "**may not** issue a citation in lieu of arrest and detention" – deprive officers of any discretion to issue a citation instead of physically arresting an individual for whom the officer has probable cause to believe violated a no contact order, the language of the no contact order itself confirms the mandatory nature of Zilge's alleged obligation to physically arrest Van Keuren. The no contact order issued to Van Keuren provides: "TO: A PEACE OFFICER OF THE STATE OF MINNESOTA. THE COURT HEREBY ORDERS LAW ENFORCEMENT TO IMMEDIATELY ARREST DEFENDANT UPON OBSERVING VIOLATIONS OR HAVING PROBABLE CAUSE TO BELIEVE DEFENDANT HAS VIOLATED THE TERMS OF THIS ORDER." (Eblen Aff., Ex. B, Docket No. 201.) The judge issuing the order likewise emphasized to Van Keuren that he would be "picked up or . . . thrown in jail" if he violated the order. ADT argues that this case resembles *Thompson*, in which the Minnesota Supreme Court found that a policy requiring officers to use red

lights and sirens during a pursuit created a ministerial, mandatory duty. 707 N.W.2d at 674-75.

In *Thompson*, however, the red lights and sirens were available for the officers to use. In this case, by contrast, due to extenuating circumstances, Zilge was simply unable to fulfill the domestic abuse statutes' mandate. When Zilge arrived at the junior high school, Van Keuren's whereabouts were unknown, and his residence was out of state. These complicating factors required Zilge to exercise discretion; after all, an officer cannot logically arrest someone immediately, as the domestic abuse statutes anticipate, when the officer does not know where he is and his home is outside the officer's jurisdiction. According to both Zilge and Hutchinson, Zilge would have had to initiate extradition procedures pursuant to the Uniform Criminal Extradition Act, in order to secure Van Keuren's arrest in Wisconsin. (Zilge Aff. ¶ 16, Docket No. 333; Hutchinson Aff. ¶ 4, Docket No. 334.) In Hutchinson's twenty years of experience as an Assistant Washington County Attorney in the Criminal Division, he has never seen a fugitive extradited from another state to Minnesota for a non-felony offense. (Hutchinson Aff. ¶ 4, Docket No. 334.) The Minnesota Attorney General, which submitted an amicus curiae brief to the Court, agrees that the statutes presuppose that an arrest is feasible and that the officer is capable of taking the suspect into custody. Construing the statute as requiring Zilge to physically arrest an individual when he was literally unable to is a result foreclosed by Minnesota law. *See* Minn. Stat. § 645.17(1) (legislature does not intend a result that is absurd, **impossible of execution**, or unreasonable).

It is ADT's position that the immediate physical arrest of Van Keuren was the only means of complying with the statutes' directive. Nonetheless, ADT highlights the absence of evidence that Van Keuren had, in fact, fled to Wisconsin, and suggests various steps that Zilge might have taken to determine Van Keuren's location, such as notifying other authorities to be on the lookout for Van Keuren, issuing an "all-points bulletin," or driving around the area. In suggesting these alternative, investigatory follow-up steps Zilge might have taken, however, ADT implicitly concedes the impossibility of Zilge making a physical arrest immediately. ADT also argues that the federal Violence Against Women Act requires Wisconsin to accord a no contact order issued in Minnesota full faith and credit, but the enforceability of the order in Wisconsin does not ameliorate the concerns described by Zilge and Hutchinson about complying with the relevant extradition provisions.

ADT cites *Nearing v. Weaver*, 670 P.2d 137 (Or. 1983), in which the Oregon Supreme Court determined that officers were not entitled to immunity for failing to carry out "mandatory arrest" provisions in a similar domestic abuse statute. In *Nearing*, however, police officers knew of **at least five separate violations** of the restraining order, but failed to take any action despite their statutory mandate. *Id.* at 139-40. There is no indication that extradition was a concern. One officer declined to arrest the individual after two violations simply because he "had not seen the [suspect] on the premises." *Id.* at 139. In this case, contrary to ADT's assertion, Zilge's actions are not

comparable to the non-response of the officers in *Nearing*.[5] Zilge gathered information from both Lee and her daughter. He left a voicemail message for Van Keuren at his residence in River Falls. He sought legal advice from the on-call Assistant Washington County Attorney about how best to proceed, and then, following the attorney's guidance, dictated a report and prepared a citation. Whether he could have done more to assist Lee, beyond these actions – that is, whether he could have exercised his discretion better – is not a dispositive inquiry. The question before the Court is not what Zilge could have or should have done given the impossibility of complying with the statutory mandate; the question is whether Zilge's actions were discretionary and therefore protected by official immunity. The Court concludes that, given the circumstances, Zilge was compelled to exercise discretion.

Moreover, counterclaimants point to an apparent conflict between the domestic abuse statutes and the Minnesota Rules of Criminal Procedure as they existed in 2006. Specifically, the domestic abuse statutes require the physical arrest of an individual for whom an officer has probable cause to believe violated a no contact order. Rule 6.01 of the Minnesota Rules of Criminal Procedure, however, **mandates the issuance of a citation** for a misdemeanor offense "unless it reasonably appears: (1) the person must be detained to prevent bodily injury to that person or another; (2) further criminal conduct

---

[5] The Court agrees with ADT's assertion that the domestic abuse statutes anticipate the possibility that an abuser will flee the scene before the police arrive. Section 518B .01, subdivision 22(c) requires an officer to arrest an individual whom the officer has probable cause to believe violated a no contact order "**even if the violation of the order did not take place in the presence of the peace officer**, if the existence of the order can be verified by the officer." (Emphasis added.) If Van Keuren's whereabouts were known and in-state – in other words, **if it had been possible for Zilge to effectuate an immediate physical arrest** – Van Keuren's absence at the school would be of little consequence.

will occur; or (3) a substantial likelihood exists that the person will not respond to a citation." Minn. R. Crim. P. 6.01, subd. 1. Rule 6.03, subd. 2, affords an officer **discretion** to arrest a "released defendant if the officer has probable cause to believe a release condition has been violated and it reasonably appears continued release will endanger the safety of any person." In 2006, Van Keuren's violation of the no contact order was considered a misdemeanor. Minn. Stat. § 518B.01(22)(b) (2006).

"[I]n matters of procedure rather than substance, the Rules of Criminal Procedure take precedence over statutes to the extent that there is any inconsistency." *State v. Johnson*, 514 N.W.2d 551, 554 (Minn. 1994); Minn. Stat. § 480.059, subds. 1, 7. While recognizing that "[m]any statutes and rules have both procedural and substantive aspects[,]" the Minnesota Supreme Court has described the distinction:

> [S]ubstantive law [is] that part of the law which creates, defines and regulates rights, as opposed to 'remedial law', which prescribes the method of enforcing the rights or obtaining redress for their invasion. The California Court of Appeal provides another helpful definition, "a statute is procedural when it neither creates a new cause of action nor deprives defendant of any defense on the merits."

*Johnson*, 514 N.W.2d at 554-55 (footnote, internal quotation marks, and alterations omitted); *id.* at 555 (concluding that the certification process by which a misdemeanor is treated as a petty misdemeanor is a matter of procedure in which the criminal rule takes precedence over the conflicting statute); *see also Santiago v. State*, 644 N.W.2d 425, 444 (Minn. 2002) (finding an inconsistency between a statute requiring a court to consider two factors when evaluating whether pretrial severance is proper and a rule compelling consideration of four factors, and concluding that the rule takes precedence).

Counterclaimants concede that § 518B.01 is a substantive statute, since it creates and describes an offense. Section 629.72, however, governing bail in cases of violations of domestic abuse no contact orders, arguably **is** procedural. It simply addresses the procedures to follow when probable cause exists to believe a violation of offenses described in § 518B.01 have occurred.

ADT argues that, even if Rule 6.01 and § 629.72 are procedural, there is no conflict between them since both authorized a warrantless, custodial arrest of Van Keuren. Rule 6.01 permits an arrest if, among other reasons, a person "must be detained to prevent bodily injury to that person or another[,]" while Rule 6.03, subdivision 2, allows an officer to arrest a released defendant on probable cause to believe he has violated a condition of his release, and the reasonable appearance that his continued released will endanger someone's safety. While it is true that Zilge may have been empowered under the criminal rules to effectuate a physical arrest of Van Keuren, given the danger he posed to Lee, the rules gave him the **discretion** to arrest Van Keuren by citation or physical arrest while § 629.72 **required** a physical arrest. The question before the Court is whether Zilge failed to perform a mandatory duty or whether he was entitled to exercise discretion in the course of responding to Van Keuren's violation of the no contact order. If the criminal rules empowering Zilge to exercise discretion take precedence over the statute, then his actions following his probable cause determination were discretionary and warrant a grant of official immunity regardless of Van Keuren's disappearance.

ADT argues that even if a conflict between the rules and the statutes existed, it was not for Zilge or Hutchinson to determine that the statutes were invalid and could be ignored. The Minnesota Supreme Court has long held that "official[s] so charged with the performance of a ministerial duty will not be allowed to question the constitutionality of such a law. . . . To permit them to refuse to perform their duty on the ground that the commanding law is unconstitutional would be a dangerous practice . . . ." *State v. Steele Cnty. Bd. of Comm'rs*, 232 N.W. 737, 738 (Minn. 1930). In this case, however, Zilge did not **refuse** to perform the statutory duty to effectuate a physical arrest; rather, he reasonably believed he was unable to do so in the circumstances. While "the letter of the law shall not be disregarded under the pretext of pursuing the spirit . . . [w]hen **the words of a law in their application to an existing situation are clear and free from all ambiguity**," Minn. Stat. § 645.16 (emphasis added), in this situation the words of the domestic abuse statutes **as applied to the circumstances facing Zilge** were not clear and free from ambiguity. Zilge did not act as though § 629.72 were unconstitutional; rather, he recognized that the rules permitted an arrest by citation and, unable to physically arrest Van Keuren, exercised discretion in determining how best to apprehend him.

In *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005), the Supreme Court concluded that a citizen did not have a property interest, for purposes of a due process claim, in the police enforcement of a restraining order against her husband. The issue before this Court – whether Minnesota law imposes a non-discretionary duty to physically arrest an individual who violated a no contact order where the individual's whereabouts are unknown and his residence is outside the state – is different than that at

issue in *Castle Rock*. Nonetheless, the Supreme Court's reading of the Colorado statute, which like the domestic abuse statutes before the Court mandates the arrest of an individual who violates the terms of a no contact order, is instructive. Considering the statute, the Court held:

> We do not believe that these provisions of Colorado law truly made enforcement of restraining orders mandatory. **A well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes**.
>
> In each and every state there are long-standing statutes that, by their terms, seem to preclude nonenforcement by the police. . . . However, for a number of reasons, including their legislative history, insufficient resources, and **sheer physical impossibility**, it has been recognized that such statutes cannot be interpreted literally. . . . [T]hey clearly do not mean that a police officer may not lawfully decline to . . . make an arrest. As to third parties in these states, the full-enforcement statutes simply have no effect, and their significance is further diminished.
>
> . . . .
>
> . . .The practical necessity for discretion is particularly apparent in a case such as this one, where **the suspected violator is not actually present and his whereabouts are unknown**. . . .
>
> . . . .
>
> . . . Even in the domestic-violence context, . . . **it is unclear how the mandatory-arrest paradigm applies to cases in which the offender is not present to be arrested**. . . . [M]uch of the impetus for mandatory-arrest statutes and policies derived from the idea that it is better for police officers to arrest the aggressor in a domestic-violence incident than to attempt to mediate the dispute or merely to ask the offender to leave the scene. Those other options are only available, of course, when the offender is present at the scene.

*Id.* at 760-63 (internal quotation marks and citations omitted) (emphasis altered). The Supreme Court has clearly recognized that often an arrest will be impossible despite

seemingly mandatory statutory language. That is the situation Zilge faced. Unable to physically arrest Van Keuren, he was compelled to exercise discretion in apprehending Van Keuren as best he could. As such, he is entitled to official immunity.

As to the Police Department, "vicarious official immunity protects the government entity from suit based on the official immunity of its employee." *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998). "In general, when a public official is found to be immune from suit on a particular issue, his government employer will enjoy vicarious official immunity from a suit arising from the employee's conduct." *Schroeder v. St. Louis County*, 708 N.W.2d 497, 508 (Minn. 2006). Since, as the Court concludes, Zilge is entitled to official immunity, the Police Department is entitled to vicarious official immunity if "failure to grant it would focus stifling attention on the official's performance to the serious detriment of that performance." *Wiederholt*, 581 N.W.2d at 316 (internal quotation marks omitted). ADT has not provided any reason why the Police Department should not receive vicarious official immunity in the event that Zilge is protected by official immunity, and the Court finds none. Since Zilge cannot be held liable for his actions, his employer the Police Department is in turn entitled to vicarious official immunity. Accordingly, the Court denies ADT's motion for summary judgment on the comparative fault of the St. Paul Park Police Department.

## II.     MATTERS RAISED IN THE PARTIES' LETTERS

The parties have also raised numerous other matters in letters to the Court. First, ADT has requested that the Court reconsider or "clarif[y]" certain evidentiary rulings in

the March Order. (Letter at 1, Docket No. 324.) Pursuant to Local Rule 7.1(h), parties requesting reconsideration must first obtain the Court's permission to file a motion, and such a motion may only be granted "upon a showing of compelling circumstances." ADT's letter seems to suggest general concern that the Court made evidentiary rulings in the March Order, but courts routinely do so on summary judgment since only admissible evidence may be considered in deciding such a motion pursuant to Federal Rule of Civil Procedure 56. Indeed, in its March Order the Court was compelled to assess numerous evidentiary objections **lodged by ADT** and highlighted in its briefing, including its objection to the testimony of Lee's sister as hearsay.

The only specific evidentiary ruling in the March Order cited by ADT is the Court's determination that a Model Sales Call and Model Sales Call Appendix disclosed by ADT and seemingly identified by ADT's own employee in a deposition was admissible. *See ADT Sec. Servs., Inc.*, 2011 WL 1084031, at *3 n.1. The appendix includes language stating that an alarm will sound immediately after the telephone lines have been cut. This document is one, but certainly not the only, piece of evidence counterclaimants have proffered in support of their theory that Lee was fraudulently induced to sign the Residential Services Contract with ADT. *See, e.g.*, *id.* at *12, *12 n.9 (discussing other evidence of fraudulent misrepresentations regarding ADT's telephone line monitoring, including an ADT technician's testimony that ADT had no policy of disabling the telephone fault line monitoring feature from its systems). ADT objects, as it did at oral argument on the summary judgment motions addressed in the March Order, that the Model Sales Call documents operative at the time that Benjamin Crickenberger,

the ADT employee who sold the system to Lee, was trained did not contain any representation regarding an alarm sounding when the telephone lines were cut. In the March Order, however, the Court noted that:

> Crickenberger testified that as part of his job training, he completed an ADT course entitled "Selling to the Residential Market," which included a discussion of ADT's "Model Sales Call." When shown an ADT Sales Representative Agreement in which representatives "agree to learn the Model Sales Call Process and follow it in all future sales presentations of ADT's products and services to potential ADT customers[,]" Crickenberger testified that he had agreed to follow the protocol, although he characterized the Model Sales Call Process as "a guideline". Crickenberger also authenticated the "Selling to the Residential Market" curriculum.

*Id.* at *3 n.1 (record citations omitted). Accordingly, the Court concluded that "these materials are admissible evidence, although a jury can certainly decide what weight to accord them." *Id.* When rendering its decision, the Court had before it the lone Model Sales Call and Model Sales Call Appendix included in the record, and ADT's briefs cited no evidence of any other version.

It has come to the Court's attention that only after the parties submitted their voluminous summary judgment briefs, after oral argument on the motions, and long after Crickenberger's deposition (August 27, 2008) and the close of discovery (July 15, 2009[6]), ADT disclosed to counterclaimants **for the first time** versions of the Model Sales Call allegedly predating the one presented to the Court. In its letter requesting reconsideration, ADT describes this evidentiary ruling as "premature at this point." The Court's ruling was not premature; to the contrary, ADT's disclosure of this material and

---

[6] Limited fact discovery was permitted after this date arising out of counterclaimants' motion to compel. *See ADT Sec. Servs., Inc. v. Swenson*, No. 07-2983, 2010 WL 2954545 (D. Minn. July 26, 2010).

its objection are inexcusably late.  At oral argument on the instant motion, counterclaimants' counsel detailed the long history, beginning in 2008, of their numerous and varied attempts to obtain such documents through discovery.  Counterclaimants reasonably presumed, **as did the Court**, that when Crickenberger discussed the Model Sales Call in his deposition he was referring to the **only one disclosed by ADT**.  ADT blames its flagrant violation of its discovery obligations on attorney error; whatever the cause, it is unacceptable.  The time for ADT to disclose different versions of the Model Sales Call was during discovery, and the time to raise concerns relating to the various versions was at summary judgment, before the Court issued its eighty-five page order, not now.

In its letter objecting to ADT's reconsideration request and at oral argument, counterclaimants argue that the Court should not only deny ADT's request for reconsideration but also sanction ADT for its discovery abuse.  Counterclaimants' requested relief includes a hearing in which "a high level executive from ADT should be required to appear . . . to explain why sanctions should not be imposed[,]" (Letter at 2, Docket No. 325), a third party forensic analysis of the native formats of the newly produced Model Sales Call versions, and the opportunity to depose David Zakrewski, a Honeywell engineer proffered by ADT as a fact witness.  Counterclaimants have suggested that the dates on ADT's newly proffered Model Sales Call versions may have been intentionally altered to serve ADT's purposes.  At oral argument, the parties also discussed the possibility of deposing Crickenberger again, and of deposing individuals involved in the printing of ADT's Model Sales Call documents.

The Court has discretion to sanction parties who violate pretrial orders. Fed. R. Civ. P. 16(f); *Firefighter's Inst. for Racial Equal. ex rel. Anderson v. City of St. Louis*, 220 F.3d 898, 902 (8th Cir. 2000). It is the Court's firm conviction that re-opening discovery and conducting a forensic analysis of these untimely disclosed documents at this stage in the litigation will more likely benefit than punish ADT. Instead, the Court will deny ADT's reconsideration request and allow all evidentiary rulings in the March Order to stand. Further, the Court will prohibit ADT from entering into evidence **or referencing the existence of** any Model Sales Call other than the single one brought to the Court's attention before the issuance of the March Order. Finally, this case will be placed on the Court's next trial calendar and set for trial as soon as possible. The Court will not assess attorney fees against ADT in connection with this issue.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. ADT's Motion for Summary Judgment on the Comparative Fault of the Washington County Sheriff's Office and the St. Paul Park Police Department [Docket No. 198] is **DENIED**.

2. ADT's request for reconsideration [Docket No. 324] is **DENIED**.

DATED: May 23, 2011  
at Minneapolis, Minnesota.

s/ John R. Tunheim  
JOHN R. TUNHEIM  
United States District Judge